FURCHES, C. J., and DOUGLAS, J., dissenting.
INDICTMENT — FIRST COUNT.
"The jurors for the State, upon their oath, present, that J. L. Howardalias Frank Thompson, A. L. Daley alias Gonez Bono, and H. D. Hawley, late of the county of Guilford, on the 22d day of March, A.D. 1901, with force and arms at and in the county aforesaid, being persons of evil minds and dispositions and seeking to get their living by various subtle, fraudulent and dishonest practices, in secrecy, with deceit and with intent to defraud, among themselves unlawfully, wilfully, fraudulently, feloniously and deceitfully did combine, conspire, confederate and agree together by divers false pretenses and subtle means and devices, to obtain from one Paul Garrett large sums of money, and him, the said Paul Garrett, to cheat and defraud out of his moneys, goods and chattels, contrary to the form of the statutes in such cases made and provided, and against the peace and dignity of the State."
SECOND COUNT.
"Second Count. The jurors for the State, upon their oath, do further present, that J. L. Howard alias Frank Thompson, A. L. Daley alias Gonez Bono, and H. D. Hawley, late of the county of Guilford, on the 22d day of March, A.D. 1901, being persons of fraudulent minds and evil dispositions, *Page 586 
and wickedly devising and intending to rob one Paul Garrett of his moneys, goods and chattels, did unlawfully, wickedly and feloniously conspire, combine, confederate and agree together, in and upon one Paul Garrett in the peace of God and of the State then and there being, feloniously to make an assault, and him, the said Paul Garrett, in bodily fear and danger of his life, then and there feloniously to put, and the moneys, goods and chattels of the said Paul Garrett from the person and against the will of the said Paul Garrett, then and there feloniously and fraudulently to steal, take and carry away as by the said J. L. Howard alias Frank Thompson, A. L. Daley alias Gonez Bono, and H. D. Hawley, had been mutually agreed and undertaken to do; to the evil example of all good citizens, and against the peace and dignity of the State.
THIRD COUNT.
"Third count. The jurors for the State, upon their oath, do further present, that J. L. Howard alias Frank Thompson, A. L. Daley alias Gonez Bono, and H. D. Hawley, late of the county of Guilford, being persons of fraudulent minds and dispositions, and wickedly devising and intending to cheat and defraud the said Paul Garrett of his moneys, goods, chattels and property, did, on the 20th day of March, A.D. 1901, in the county of Guilford aforesaid, feloniously, wickedly and deceitfully combine, conspire, confederate and agree together to cheat and defraud the said Paul Garrett of his moneys, goods, chattels and property as aforesaid by the false and deceitful color and pretenses as follows, to-wit, by him, the said J. L. Howard alias Frank Thompson, pursuant to a conspiracy, confederation and agreement theretofore had and made between him and his co-conspirators above named, falsely, fraudulently and deceitfully pretending and representing to the said Paul Garrett, that he, the said J. L. Howard *Page 587 alias Frank Thompson, and his associate and confederate, Gonez Bono alias
A. L. Daley, were then and there the owners of and in possession of large blocks of gold as well as the owners of large and valuable mining interests in Arizona, which said gold was held by the said Gonez Bono on Buffalo Creek, near the city of Greensboro, where the said Paul Garrett was then and there taken, and the said blocks of metal then and there shown him; when the said J. L. Howard alias Frank Thompson, pursuant to the conspiracy theretofore had and made, pretended that the said blocks of metal were solid gold 22 karats fine, and of the value of many thousands of dollars, which they offered to demonstrate by a chemical analysis, to be made by their said co-conspirator, H. D. Hawley, who was then and there waiting near by in the city of Greensboro with an assayer's outfit to fraudulently and falsely analyze and assay said spurious metal and pronounce it pure gold, thereby aiding his co-conspirators in the execution of their common, fraudulent and felonious design to cheat and defraud the said Paul Garrett, in pursuance of a common conspiracy and confederation had and made by and between the said J. L. Howard alias Frank Thompson, A. L. Daley alias Gonez Bono, and H. D. Hawley. And the said J. L. Howard alias Frank Thompson, then and there sought to dispose of and sell to said Paul Garrett the said blocks of metal for a large sums of money; whereas, in truth and in fact, the said blocks of metal falsely and fraudulently represented to be gold were not gold, but of a cheap and comparatively worthless metal, by means of which said false, fraudulent and felonious representations, the said J. L. Howard alias Frank Thompson, A. L. Daley alias Gonez Bono, and the said H. D. Hawley sought and attempted to obtain unjustly and unlawfully large sums of money from the said Paul Garrett, contrary to the form of the statute in such cases provided, and against the peace and dignity of the State.
(Signed) "BROOKS, Solicitor." *Page 588 
PAUL GARRETT, DIRECT EXAMINATION.
That on Friday, June 7, 1901, being one of the days of said term of the Court, the State to prove its case produced and had sworn one Paul Garrett, whose testimony so given tended to prove in substance as follows:
"My name is Paul Garrett; I live in Weldon, North Carolina. Saw the defendant J. L. Howard alias Frank Thompson, Wednesday morning, March 20, 1901, about 9 o'clock, at my office in Weldon, N.C."
And was then asked by the said Solicitor this question:
"Q. Now, you may go ahead in your own way and state to his Honor and the jury the circumstances under which he came there, and what occurred between you?"
To which question the defendants, by their counsel, objected, on the ground that the indictment alleged the offense charged therein and its venue as having been committed in Guilford County, and that the Court would take judicial notice that Weldon was in Halifax County; and that being so, no acts or declarations by any one or more of the defendants occurring in any county other than Guilford were competent, relevant and material; and this because it related to another jurisdiction than the one alleged in the indictment, where the defendants might be prosecuted.
First exception to evidence. Which objection was overruled by the Court, and defendants then and there, by their counsel, duly excepted.
The Solicitor then announced to the Court that he proposed to prove by witness certain declarations and acts that are to be afterwards connected as to be evidence before the jury, of the conspiracy among the defendants now on trial, that if such acts and declarations of the defendant Howard are not so connected, then such will not be asked as evidence against the other defendants. *Page 589 
To which proffer by the State, defendants, by their counsel, objected, as same is not sufficient to authorize the testimony of certain acts and declarations of the defendant Thompson in a county other than Guilford, and in the absence of the other defendants.
Second Exception. Which objection was overruled by the Court, with direction to witness to proceed; to which ruling of the Court defendants, by their counsel, then and there duly excepted.
On the morning in question, as I before stated, I was dictating my correspondence to my stenographer. The door to the room was opened and a man appeared there. He was in the garb of a miner, or a laboring man of the better class. He asked if Mr. Garrett was in. I replied that he was, and asked what he wanted. He stated that he wished to have a private interview. I replied that I was busy at that time, and that he would have to have a seat in the outer office. I finished the letter on which I was engaged, and went into the next room and asked the gentleman what it was he wished. There was another clerk present, and he, looking over at him, said that he wished to see me privately. I stated that any business matter could be discussed in the presence of this clerk. He stated he must see me entirely alone. So instead of stopping the clerk and sending him out, I went on the outside with him. Arriving at the outside, he asked me if I had a brother named Andrew Garrett. I told him no, that I had no brother, that I never had but one, and he died in infancy. He said that he was mighty sorry, that he was looking for Andrew Garrett's brother; that he was from Arizona; that Andrew Garrett was his partner there a number of years before, and that Andrew had come east in response to an invitation from an aunt of his, who lived in Charlottesville, Va., to take charge of her affairs; that she was quite a wealthy woman, and he had come to take charge *Page 590 
of her affairs; that they had an understanding when he left, which was four years before, that any time either of them got anything good, they would acquaint the other with the fact. That in the meantime he had "struck it rich," and in the company of an Indian chief — I think he said an Indian chief — he had come east to look for Andrew and to buy machinery for his mine. I cut him rather short; told him that, unfortunately, I was neither Andrew nor Andrew's brother, and I did not see how I could serve him at all. He said it appeared to him like nobody wanted to talk to him; that everybody seemed to think he wanted to get some money out of them. He pulled out his purse and exhibited quite a roll of money. I told him that I did not see where it interested me at all, that I was not Andrew's brother. Well, he said, they were in search of Andrew's brother, and they were coming along east, the Indian, whose name was Gonez Bono, had eaten a lot of trash on the train, candy and peanuts, etc., and had gotten sick, and at Greensboro he refused to go any further, and he had taken him off the train here and carried him out in the woods; that the Indian would not stay in the house, he had to have a camp in the woods. That he had gone on through Greensboro to Charlottesville, looking for Andrew, but when he got to Charlottesville he found that Andrew had died; that his aunt had moved to Washington City, and that he had asked of that family in Charlottesville, and he was told that in Weldon there was a man named P. Garrett; that he knew that Andrew had a brother named Peter Garrett, and he thought this might be the man; and he was mighty sorry that I was not Andrew's brother. I told him that inasmuch as such good things were in view, I was sorry myself that I was not Andrew's brother, but I didn't see how I could help it. I was not; that my name was Paul instead of Peter. We exchanged condolences on the death of Andrew and the absence of his brother, and the result of it was he said he had been making some inquiries about me *Page 591 
before he got there, and found that I was pretty good at figures and an honest man, and that he was looking for such a man to look after the business of their affairs, that he was a very ignorant man, could not read nor write, nor make figures, and that they wanted some good, reliable man to take charge of their business interests; that they had with them two bars of gold (he may have said chunks), two pieces of gold; and they were on their way to Philadelphia mint to sell the same, and the proceeds of which were to be invested in mining machinery, outfit, etc. The conversation proceeded along those lines — a good deal of repetition in it, and, as confirming his statement about the circumstances, he gave me some incidents in his life of his trip east. That at Albuquerque, New Mexico, at which point I think he said he took the train to come east, he had met up with some character in that country whose business it was to keep an eye on every new mine that was started and cheat them out of their claims, and this fellow had tried to pump him out of his information, but he had been very discreet and had not said anything about the discovery of this gold mine; in confirmation of it, he drew this from his pocket. It is an envelope purporting to be from a hotel in Minnesota; there was no address on it, but he had a clipping, which purports to be an extract from some newspaper. He handed it to me and asked me to read it to him. He said some fellow had read it to him, but he was not sure it was read right.
Which paper, in substance, was that Frank Thompson and an Indian chief, named Gonez Bono, were on their way to Philadelphia to dispose of the product of a certain gold mine in Arizona, and that they were very careful in not disclosing its location, or saying much in particular about it, for fear that some one would discover its location and take it from them before they had filed their claim thereon.
That the defendant Thompson then said that the Indian, *Page 592 
Gonez Bono, stopping at Greensboro, was the same that accompanied him there. That after exhibiting these pieces of paper, and some other conversation along the same line, he also exhibited a little bag and began shaking it, and in it were specimens of ore and a little gold bar, about, I suppose, three and a half or four (3 1/2 or 4) inches long, and one and a half (1 1/2) inches wide, one-tenth or one-eighth (1-10 or 1-8) of an inch thick. I think I could identify it, and it is among the effects. He showed them to me, and I handled them and handed them back, and still intimated that I did not see exactly what connection I had with the case, but that it was all mighty pretty and nice; and he then went on and said that as Andrew was dead and he could not find his brother, he didn't see why I couldn't look after it for him. He said they wanted a man to take charge of it for them, and would give him a third interest in it. I then went on to question him about the mine, how they had been working it. He said they had never had any machinery, excepting Indian squaws had "toted" part of the ore on their backs. They had gotten up this much gold in two years, and that there was a big thing in it for whoever would take hold of it and work it right. I told him that I had already taken great interest in gold mining; had worked in a gold mine a short while, had familiarized myself with it, and had a little experience with gold mining myself. He explained then the situation of the country, its location in the mountains, it was several miles, I think about 40 miles from ......... The conversation drifted along these lines. Finally, he wanted to know what I thought of it, and I told him that if there was anything in it, I didn't know that I would object to take up a proposition. I asked him what would be expected of me. He said the first thing he wanted me to do was to go along with them to Philadelphia, and sell it to the mint. That they needed somebody that could figure, *Page 593 
and I said that I had no objection to going; that I was up for business. He said that, too, I would be expected to go with them to Washington City and file the claim; that the claim had never been filed; that it was in the Indian reservation. "Well," I said, "that is going to require a good deal of time and absence from home, and I generally get pay for my services." Well, he said, they would give me one-third interest in the two gold bars. And I asked him what that would be. He said they would weigh about one hundred and fifty (150) pounds. Didn't know exactly; that somebody had weighed them for them. He seemed to be very suspicious of everybody. I asked him what it was worth. "Well, dat Jew at Albuquerque had bought ten (10 lbs.) pounds of it, and he gave me twelve $20 gold pieces for dat much." He said there were one hundred and fifty pounds of it, about $36,000, and that he would give me one-third of it. I asked him what the mining outfit was going to cost, and he enumerated; and I figured that the mining outfit would cost $20,000, and there would be a balance left of $16,000, of which I was to have one-third. He asked me what my part would be. I told him it would be something like $5,000. He said he reckoned we could have a good time in Philadelphia on that after paying our expenses. I told him yes, it might serve for a short trip. "But," said I, "I don't know anything about these gold bars. I want to see something beside that. If I leave my business, I will have to get somebody here to look after it for me." He wanted to know what I wanted for my services. I told him it was hard to place an estimate on my services, but I would not make a charge less than $25 a day to recompense me for my absence from my business and my expenses. He said he thought I put a pretty good value on my services. I told him I did. He said, well he didn't mind paying a good man, for he wanted a good man, he wanted an honest man, *Page 594 
and that they told him I was honest; that he had met a man on the train, and had inquired about me downtown, and he consented then to it, so far as he was concerned; said he would not mind if the Indian would not mind; he would have to see the Indian about it before he could consummate it. Wanted to know if I would not go back with him and see the Indian that afternoon. I told him that I had an engagement in Norfolk to-morrow, that I could not go this afternoon. I can't remember now, there was quite a number of questions passed. I said, "You go on to Greensboro. I will go to Norfolk. You want to go to Philadelphia. I can go right ever to Philadelphia and get this matter transacted. I will make my arrangements to leave home. He said the Indian was mighty curious and mighty suspicious, and he was afraid be could not get him off. In fact, he didn't have but twenty days' leave of absence from Col. Crook, and they had been off twelve days, and the Indian was getting restless and wanted to go back anyhow. I told him I did not know how I could help him then, that I could not break my engagement at Norfolk. He asked me if I could come to Greensboro. "Certainly," I said, "I can, but if you want to go to Philadelphia, come by Norfolk, and I will go with you on these terms." Well, he said, maybe we might arrange to do it, but he didn't know what he would do with the Indian. Then he asked me if I would not agree to go on Friday. But in the meantime he had gone on a good deal about the vast resources of this mine. It was plausible in one view, and it was not plausible in another. It was mighty pretty. I told him then that if the Indian was willing and he would let me know at Norfolk, I would come back. He said they didn't have any time to lose. I said, "you can telegraph me at Norfolk to-morrow." He wanted to know what a telegram was. I said, "You write the message to me and carry it to the telegraph office, and they send it to me." He *Page 595 
wanted to know how that was, if they stuck it on the wires and they sent it to me. I explained. He seemed to be very much enlightened as to what a telegram was, and said that would work all right. But how was he going to manage it? He didn't want to take anybody else into his confidence. I said, "I will write out a telegram here, and if the Indian is willing, you can send it to me." He said that would be a good idea. So we then went into my office. All this conversation took place on the outside. The young man was still sitting there, and I took down a telegraph blank and wrote it. "Now," I said, "if Gonez is willing to this proposition, you will send this telegram." The telegram read, "Gonez willing; come at once; will meet at train." I signed it, at his suggestion, "Frank Thompson." "Now," he says, "suppose the Indian is not willing?" I said, "Well, I will write another one." And I really can not recall that one, but it was to the effect that Gonez refused to agree. I wrote the telegram, and he said, "I can't tell one from the other." "Well," I said, "I will put a cross-mark in blue pencil on the one that means "yes"; on the other, not to come, I will put a round mark." And I made him repeat it. "You say you are going to pay my expenses." He pulled out his purse and handed me a $10 bill. I looked at itpretty closely and put it in my pocket. We talked a little while on that line, and he asked me about the trains — when one went back. I told him shortly after noon. I told him I would meet him of the train. He went out, and had to go round the corner of the house, and go back right in full view of my office, which has three compartments. The front office is occupied by two young men, and the rear offices, one of them is occupied by myself and another young man, who hears everything that goes on of a business matter; and the one at the rear, or at the farther angle, is occupied by the stenographer, and I dictate my letters in that office generally. I walked into *Page 596 
the office as he turned the corner, and touched the two young men on the shoulder. I didn't want the stenographer to hear. I said, "If you want to see a genuine gold-brick man, look out of the window quick." They both ran to the window. I said, "If he is not one, I never saw one." I rang the `phone and called up the Revenue Officer at Littleton, N.C. whom I know personally, and under the suspicion that the bill I had from Howard was a counterfeit bill, I told him I would like to have him come down that afternoon on the next train, I wanted to see him on a matter of importance. Thompson was crossing the bridge then. He answered, and said that he would be down on the next train. I went on and finished what correspondence I could, and about the noon hour, as usual, I went to town. I took with me the deposits for the day. I went to the bank at once and made my deposit, and went into the cashier's private office and told him that I had a big proposition, that I was about to go into the gold mine business. We had a conversation on the merits of the case. I went over the situation with him.
Q. Mr. Garrett, when was it that you began to suspect him? That there was something wrong about it?
A. The real suspicion began when he made reference to the Indian being out in the woods.
Here defendants, by their counsel, objected to the witness relating any further of the conversation then or subsequently occurring between him and the defendant Thompson with respect to the gold mine, or its supposed product, or the Indian in the woods, etc.
Third Exception. Which motion was overruled by the Court, and the witness directed to proceed; to which ruling of the Court the defendants then and there duly excepted.
Witness proceeds: I have omitted just one item in answer as to what my services would be. I explained to him that inasmuch as the claim was all right, I could not leave my *Page 597 
present business to take charge of the mine in Arizona. It was agreed between us that if it would be agreeable to the other parties, that we would employ a timekeeper, bookkeeper and general manager, to be paid from out of the expenses of the mine.
Q. Was there any consideration or suggestion made as to what part?
A. One-third interest.
Q. It was agreed that you were to employ a bookkeeper?
A. Yes, sir. He was to work on a salary. Another point I will bring in right here. While writing these telegrams, there was an electric light over my desk of a little peculiar pattern, and he got down and looked at it and said, "What might that be?" I told him that was an electric light. He said, "What's that?" I told him, "It gives light here at night." He said, "How do you light it? do you stick a match to it?" I told him no, that I turned a little peg and it lit up, and I turned another one and it went out. He said a boy down at the hotel showed him. He wanted to know if I could explain it. I told him no, that I was not sufficiently an electrician to explain it. I told him at home I would see him at the train. I went to the bank and talked with the cashier, and told him to go down to the depot and stand around and observe the man that I was talking to. When I went up he was buying his ticket. I stood on the outside, and as soon as he saw me he came and engaged in conversation again. He said the ticket cost so much and he gave him a bill for so much, and asked me if he gave him the right change. I counted his money, and told him his change was correct. I asked him what hotel he stopped at. He said the tavern right there. He said he had to get the tavern keeper to write his name on the book, he didn't know what that was for. I told him that was customary. He wanted to know if he didn't charge him too much for lodging. *Page 598 
I told him no, that was the regular charge. He said, "He asked me if I was a commercial man, I believe." I said, "What did you tell him?" "I said I didn't know what that was." I told him they gave drummers a special rate, "If you had told them you were a commercial man, I guess that would have been all right." And the conversation drifted along these lines. He then had me read this paper to him again, and he went over again the question of the cost of the mining outfit. And according to the understanding there, I took out a letter which I had in my pocket, and on the back of it had him give me the cost of the mining outfit.
(Letter marked Exhibit "A" introduced, was a pencil memrandum [memorandum] by the witness of mining machinery, consisting of engines, boilers, derricks, wagons, plows, picks, horses, harness, etc., of the aggregate value of twenty thousand ($20,000) dollars.)
He then asked me if that was not pretty good pay for my services. I told him yes. I began to question him further about the mine. He intimated in his conversation that the output of the mine would assay, with the machinery we proposed to buy, a million dollars a year apiece. I then asked him about the general conditions of the country, health, water, atmospheric conditions, nice country to live in; if there was any hunting and fishing. He said he was not fond of hunting, but that he hunted sometimes to get game for the camp, could shoot with a rifle, but never could shoot with a pistol. I asked him if he ever carried any weapons with him. He said no, that when they came to take the train they brought along the rifles in the wagon, but they sent the rifles back; that he was not a good shot with a pistol. I replied that I was a very poor hand also. We discussed other matters. While we were talking, the cashier of the bank came forward, and I had seen him standing near. The cashier walked up and remarked, "Mr. Garrett, it is about the time of day that *Page 599 
I take my drink. Won't you and your friend come and have a drink with me?" "Mr. Smith, let me introduce you to Mr. Thompson, of Arizona," I said. Thompson declined, and I declined also. We continued our conversation then, and he said coming out east was mighty tiresome, that he didn't mind it for the first day or two, but he passed El Paso, and after he left it was a long, tiresome road; that he crossed a big river. I said, "The Mississippi?" He said yes, that he thought it was. He said there was a great big city there, and he had to lay over there. He counted up the time they had been away from Arizona. He said up to that day they had been away 12 days, that the Indian's leave of absence would be out in 20 days, and the Indian was getting very restless and uneasy, and wanted to go back to the reservation; that they would imprison him if he did not get back in time, and that it might be that the Indian would be so worried out and tried that we would just have to buy the Indian out, and let him go back home. I asked him what he thought he would take. Thought the Indian's share would be about $12,000. He then said that the Indian was mighty suspicious anyhow, and that at New Orleans they had run up against a man there; the fellow come up to him looking real nice; said he had on a white shirt, stiff collar, a great big diamond in cravat; said he was walking up and down the platform, and this fellow came up and spoke to him, and asked him where he was going. He told him he was going to Charlottesville, Va. He asked him if he knew anybody in Charlottesville. He told him no, that he was looking for a man named Andrew Garrett. He said, "Why I live in Charlottesville, and know him very well." They got to talking, and he said after talking a little with the fellow he told him he was in mighty hard luck, and that he and his brother, who had consumption, had, I think, started from Colorado to Arizona for his brother's health, but his brother died on *Page 600 
the way, and he was on his way back to Charlottesville. He said, "I am in hard luck. I have not got any money in my pocket to buy my ticket. I wish you would loan me enough money to buy my ticket, etc., and when I get on the train I will pay you back." Well, he said the fellow seemed honest, had a good face, and said that his mother had always told him to be honest.
Said his mother, after his father's death, had grieved herself to death, that she kept a little testament, and sometimes she would read it and cry, and told him he must not tell a lie, that if he told a lie he would go to hell, and that he didn't believe that a man like that would tell him anything but the truth, and so he pulled out his roll of money and started to count it out, and said when he did Gonez commenced to shake his head. But he knew that Gonez hadn't heard him. So he counted him out $300. Said the fellow was mighty nice, and they got on the train. The first station they got to, he left his seat, and when he came back to look for the fellow, he didn't see him, but he thought he would turn up directly. After going by two or three stations, he went to the man who had the buttons on his coat, and asked him where his friend was who had the corpse on the train. He said there was no corpse on the train. He told him yes, there was, for his friend had told him so, and he knew his friend would not lie to him. The conductor told him not to talk to every stranger that he came up with, and he would better divide his money into two rolls so as not to show it all at the same time. He said he followed the conductor's advice, and since that time he carried some of his money in one bag and some in another. I told him that he must be pretty unused to the ways of the world, and I thought he needed someone to look after his affairs for him. While we were standing there talking about various things, he said while he was in Charlottesville the other day he saw a woman coming down the street riding on *Page 601 
a little seat with two wheels made out of wire. Said, "How in the name of the Lord did she sit on that?" "Why," I said, "didn't you ever see a bicycle?" Said, "No, what was that?" Said he saw something else, "saw a little car on the street about half as long as a railroad car, and that it had a pole on top of it and a man standing out in front of it, and it just went along with nothing pulling it and nothing pushing it." "Why, that is an electric car," I said. And he wanted me to explain to him what electricity was. I told him that was beyond me, that I could not do it. He explained to me then, in this conversation at the shed, if Gonez agreed to the bargain, that when we came to Greensboro we would go out and see Gonez, and have a talk with him, and bore into the bricks and bring them back to town and have them tested, and if the tests showed up all right, and if the Indian was still uneasy, why we would just buy the Indian out, and let him go on back. He was a great deal of trouble. His time was nearly out, and he doubted whether he could get through with the work in Philadelphia and get through filing the claim in Washington in time for the Indian to get back.
I agreed to the estimate that he gave me of the value of the gold as $36,000, and the cost of the machinery, $20,000, which would leave $16,000 to be divided between the Indian, myself and himself as pin money. He intimated that if the Indian would not go to Philadelphia we would just buy him out, and he made some inquiries as to how much money I could raise. Up to this time he made no suggestions as to what the Indian could be bought out for. He afterward said, "We will just buy the Indian's share and let him go home. It's worth $12,000." This beaded bag is the one he showed me, and contained two or three pieces of ore and a small bar of gold. The defendant sitting in the middle with glasses is Howard, the one who showed me the bag or gold; and his appearance now is different than it was then; then he had on *Page 602 
a flannel shirt, good and substantial, but showed evidences of use, and he had a full beard. I saw him take the train at Weldon for Greensboro, and I awaited the arrival of Mr. Lewis, the gentleman whom I had `phoned. I simply transacted my own business affairs. After a conference with Mr. Lewis, I drove out in the country late in the afternoon, just before dark, to the house of Mr. H. A. Mims. I reached there just about dark. It was raining. I called Mr. Mims to his front gate. I engaged Mr. Mims to come to Greensboro and confer with the authorities here.
Q. Did you give Mr. Mims any letter of instruction?
A. After I got home. I drove back home then, and addressed this letter myself to Mr. Patterson, accompanying it with a letter, a short note of introduction, to Mr. Lewis. I wrote the letter myself; I addressed this letter to Mr. Patterson. Mr. Mims reached my house at about 8:30, or a quarter to nine. I wanted him to take the 9 o'clock train. I handed him the letter, and told him to read it for his own intelligence, and to confer with Mr. Patterson here, and the other authorities to whom he might introduce him. On the next morning I fulfilled my engagement in Norfolk. There is now a point I omitted to state. I sent a telegram to the Chief of Police at Richmond, I think that night. I wrote it in the afternoon, but don't think I sent it until that night. I received the telegram in Norfolk, Va., at the Monticello Hotel, about night, from Thompson. I have the telegram that I received. Telegram reads: "Greensboro, N.C. March 21, 1901. Paul Garrett, Norfolk, Va., care Monticello Hotel. Gonez willing; come at once; will meet all trains. Frank Thompson."
Q. One other question, Mr. Garrett. What was the arrangement between you and Mr. Howard as to how much you should receive? *Page 603 
A. Twenty-five dollars a day and my expenses, and he handed me $10 on account.
Q. In response to the telegram, what did you do?
A. In response to the telegram, I came to Greensboro. Reached here next day at about noon. I do not know the exact hour by schedule time. I got off the train, looked out of the window before getting off, to see who was in sight. I saw Mr. Mims walking up and down the platform. I stepped off the train and walked in another direction so as not to meet him face to face. In about a moment Howard was there, and told me he had been waiting for all trains since morning; seemed to be very disappointed because I did not come earlier. I told him I came as early as possible, that I had to come by home to leave my wife, who was in Norfolk. We walked in the waiting-room, to look around and see if anybody was there to listen. I asked him what his programme was. He said he would drive right out and see Gonez; everything was all right, he thought. Gonez was sorter uneasy, but he reckoned maybe we could fix things. I said, "I have got to have some dinner." He said that was all right, where did I want to go. I told him I thought I would go to the McAdoo House, I had stopped there years ago. So we walked up the street together. Going up the street, I had occasion to slip my handkerchief out of my pocket, and a bit of paper flew out and blew up the street; he chased it very actively, and caught it and examined it very carefully. I said, "That is nothing but a bit of paper." He showed me that he was thoroughly on the alert. I went into the hotel and registered. I turned to him and said, "You will take dinner with me?" He said no, he had had dinner. I asked the clerk the dinner hour; he said 1 o'clock. It was then a few minutes after 12. I said we would sit down here for a little talk. We sat down on the right side of the desk and began discussing matters generally. Mr. Mims walked in and took his seat *Page 604 
right near opposite. Other people passed in. I paid no attention to Mr. Mims, nor he to me. And we had quite a conversation. I had him recount again the mine. He had me count his money, to see whether he had been cheated on the trip back here. I said to him, "I'm glad you have got some money. I am busted. I went to Norfolk and took along $75, expecting to pay my expenses and the recording of the deed. I will have to borrow some money to pay my hotel bill." He said he had plenty to get to Philadelphia, and if we got to Philadelphia and sold our bars we would have lots of money. We discussed many matters there. Among them, I asked him how far the Indian was, how far the camp was from town. He said about three miles out in the woods. I said I did not know there were any woods in Greensboro sufficiently close to hide an Indian. I said I would like to know where it is, for I have been down here a good many times, and I thought the country was all cleared up for two or three miles around here. He pointed his finger right out down the railroad, a little creek down there. I did not want to press the matter too far. I thought that might be some clue as to the direction we were going. He then said, he told me this at the shed, but he repeated it more fully this time; that when we bored the brick, we would get out plenty of borings, and when it was assayed and melted down we would have a nice little piece of gold to have my wife a ring made of. I said that certainly would be nice; she would appreciate it. About this time I told him that my wife was not sure where I was going, and he explained that we could go out to the woods and bore the brick and have them assayed; he said we would come back to town and get it done at a drug store. I didn't see how a drug store was going to assay it. But this is what he said, we would go to a drug store and get it assayed, and that if everything was all right with the Indian, we would go to Philadelphia that night, but if the *Page 605 
Indian broke up the arrangement, or anything of the sort, we would buy the Indian's share and let him go on back. And then he began questioning me about raising some money, whether I could get any money, and how much I could raise. I told him he had struck me at a mighty bad time. I told him I had just bought a large piece of property which cost in the neighborhood of $40,000. He wanted to know if I paid all cash. I told him no, that was the deed that I had recorded; I had to pay about $35 stamps, and $35 for recording. They charge $1 a thousand for recording. It took $70, I remember, to complete the deed. He wanted to know if I could not raise money on that land. I told him that if the necessity arose, I could raise a little money, I reckoned. The bricks had not been weighed at that time; he told me we would go out there, and if the Indian was cranky, we would just buy him out. I would have to raise the money, but that I would be recompensed when I got to Philadelphia. I told him that on a push I reckoned I could raise a little money. He wanted to know how. I told him it would require some time. I would have to go to the bank and get identification. He wanted to know what banks were. I told him it was too much of a subject to go into fully. He absolutely confessed ignorance of banks. I then remarked that I had to write to my wife. I went into the writing-room and sat down at the desk, where I could keep him in view. At the McAdoo House, Mr. Mims walked in. I caught a chance when Mr. Thompson was not looking at me, and asked Mims to go down stairs. There was another man in the writing-room; didn't know who it was. I handed Mims a little slip of paper, some further instructions that I had jotted down on the train. I arranged for Mr. Patterson, the revenue officer, to come to dinner with me. I finished my letter, went and bought a stamp at the cigar stand, and asked the clerk, in a tone of voice that Thompson could hear, for re-assurance when the *Page 606 
next train went to Weldon, that I was anxious for my wife to get that letter. He said while I was at dinner he would get the horse and have a buggy ready when I finished dinner. The intimation was that we would make arrangements with the Indian; there was no assurance that he would back out; but there was a strong intimation that the Indian was very restless and was going to want to go back. There was a broad hint that we would have to pay him a one-third interest, but we might get out for less. I went up to dinner. I asked him if he would take dinner. He said no, he would go and get the horse and buggy, and have it ready. Mr. Patterson and I got to the table. I asked him to look around the room and see if he knew everybody there. He said he thought we were safe. We went over the plans then; I told him what had developed, and stated to him that I wished protection. I located practically the point, just picked up the question and made further developments. I think it is proper for me to say here that Mr. Patterson left me in doubt at that time, until just before we left he gave me assurance that he would go along. Mr. Patterson left the table before I did. I waited a little while. When I went down, Mr. Mims was in the corridor, and a buggy was standing at the door, held by Thompson (as I knew him then). He was standing on the ground. I passed by Mr. Mims, and he remarked that they had gotten the papers. I loitered around the lobby a few minutes, and then went out and got into the buggy. I said, "You have got no buggy robe." He said we didn't need any. I said, "March weather is very changeable; I would rather have a buggy robe, and if it will be no inconvenience I would like to have you drive up to the stable and get a buggy robe." We drove up to the stable and got tangled up in a lot of buggies, and it took some two or three minutes to get out. We drove out across the railroad. Went out southwest, I believe it is. We drove along pretty nicely. I complimented him *Page 607 
on the way he held his reins. He said he had been accustomed to driving a team of four horses, and he went again back to the question of banks, and asked me where I kept my money. I told him I didn't keep all my eggs in one basket. He said he didn't understand. I said, "Yes, you do." He said, "You mean you keep some in one bank and some in another?" I told him that was about the size of it. "Do you keep any money in Weldon?" I said, a little. "Do you keep some in Norfolk?" I said, perhaps so. I was noncommittal about the money. And again he referred to the fact that he didn't know how we would find the Indian, that when he left him that morning he seemed to be in a good humor. They were mighty suspicious, and we might find him all upset, and if so, we would just buy him out and let him go on back; he was a trouble, anyhow, and in Philadelphia he didn't know what on earth he would do with him in a city. I consented to what he said. We drove along at a nice, easy gait. At about two miles from town, he said we were approaching the place, and we would drive a little slow. I told him that it was agreeable to me, that I was not in any hurry. We drove up right behind a wagon; I think there was a man and little boy in the wagon; they were driving in a little dog-trot. We followed on for about half a mile, I think. He didn't want to pass them, they might see us. All right then, drive along behind them. Don't make any difference to me. Right at the top of the hill the wagon stopped, and the man got out to get a drink of water. He stopped his horse and said, "Now, I don't know what to do. If I drive on he'll see me." I said, "If you do not want to pass him, get out and get a drink of water." He got out and looked down the road, and said, "Somebody is watching us." "What makes you think that?" About that time a buggy drove by. I thought I recognized Mr. Patterson. I didn't know Mr. Jordan. I just got a glimpse of them. It was *Page 608 
Sheriff Jordan and Mr. Patterson. They drove right on ahead. Well, he watched those two men on horseback. He said, "I don't like it, it looks suspicious." I said, "I guess it is just two fellows that have been down to town and got a little boozy, or possibly there has something broken about the harness." He went and got a drink of water and pulled out his handkerchief and said, "I don't like the looks of those fellows, do you?" I said, "What's the matter?" "Nothing in the world, but a couple of fellows been down town and got drunk, or maybe something is broken. If you want to, we'll go back to town." He got in the buggy, drove about two steps, pulled his horse short, turned around and looked. He said, "I don't like that a bit." I said, "What's the matter? Man, you are looking mighty suspicious to me." He said they looked suspicious. I said, "Those fellows have not got any such notion. Just go right along." "All right," he said; and drove on three or four more steps and stopped. I said, "The next time you stop, I am going to take the horse and buggy and go back to town. If there is anything about this transaction that is not straightforward, I am out of it. If everything is all right, you may go along with the transaction. What if those two men do come upon us, why we will have them go on about their own business." He drove on to the foot of the hill. He drove very rapidly. I never looked back. We went over the top of the hill and down into the bottom. He said we would stop there. I noticed as we crossed the road another buggy track; I made no remark. We got out, and he began to tie the horse. I commenced unhitching my side of the horse. He said, "Don't unhitch." I said, "Yes, it is my rule always to unhitch with a strange horse." Said he didn't want to unhitch. "It is the safest plan to unhitch," I said. Said he didn't want to unhitch. So I hitched up again. After that we started off through the woods, he walking ahead. He was taking the lead. I *Page 609 
talked to him in as loud voice as I could, without seeming intentionally loud. Walking through the leaves made a good deal of noise. I suppose we walked 100 or 125 yards almost in a straight direction; he then began turning around. At last I said, "I believe you are lost out here in the woods." He said, "Oh! no, we are most there." He had doubled back in the meantime. We approached then a place that was a little marshy and woods and briars, and you could not see far through it; I was behind him about three steps, he held up his hand, and looking at me with rather a startled face, said, "Look! there is the Indian!" And in a loud voice he said (here the witness mimicked the peculiar language they used as best he could). There was a repetition of the noise in the bushes. The man in the bushes repeated practically the same thing. He looked around at me and said, "That's him." I said, "Yes," and commenced looking through the bushes. They kept up that conversation for I suppose ten minutes, with various inflections of the voice. I naturally got a little interested to see who the other man was, and I suppose I was a little too eager in peeping through the bushes. The Indian's voice I suppose got quite angry. He told me to stand up straight. I straightened back, put my hat on the back of my head, and squared up. I could see the black object in there. I saw something moving, and could see various maneuvers. He says, "He likes that better." I said, "All right." They conversed again for several minutes, and again the Indian's voice got even more antagonistic than before. He shook the bushes, and I could almost imagine I saw a tomahawk waving around in there. I said, "What's the matter with him?" He said, "He's not satisfied. You know Indians are mighty suspicious." I said, "Well, what will satisfy him?" I said, "You tell him I'm Andrew Garrett's brother." He said, "That's a good idea." So he had another conversation with him, and the Indian's voice got very soothing *Page 610 
and complacent. It dropped its tone several degrees. He said, "That fixes things all right. I will go and get the bricks. I will go and get the bar." I said, "You had better let me go with you." "No," he said, "you stand right still. The Indian don't like white men anyhow." So he approached the Indian, and they kept up this conversation between them pretty steadily, and he went to pick up the bricks, and the Indian again remonstrating quite distinctly, he sounded like a remonstrant, and he set them down and explained it to him, laid it off with his hands, etc., and the Indian gave his consent apparently, and he started off with it. He got about half way, and the Indian again raised a remonstrance and he sat down on the ground and explained to the Indian. I said, "You had better let me help you." I had a little curiosity to get a little closer view of the Indian. He said, "You stand right still." I said, "All right," so he brought them forward; in one hand he had a brace, and in the other he had a pair of spring balances. And when he came up to where I was, he said, "Now, we'll weigh them." I said, "All right." They were in some oil-cloth wrappers, with a heavy strap around them.
(Here counsel for defendant objected to the State offering in evidence the package or the substance claimed to be in the package; or substance shown or exhibited to the witness on the occasion when he accompanied and was with the two defendants Thompson and Daley in the woods near Greensboro, upon the ground of identification of the object or substance now offered as being the same, and for the further reason that the object as described by the testimony of witness was one securely done up and bound by a shawl strap, and the object now before the witness is not so done up, and is not bound by a shawl strap, and further because the package and contents are not relevant or competent.)
Before ruling upon the objection, the witness was allowed *Page 611 
by the Court to further describe and identify the package; when he said that it was black, was wrapped and tied with a leather shawl strap, and that he saw it unwrapped at the time; that it is the same package, and —
Fourth Exception. The objection was then overruled by the Court, to which defendants then and there excepted.
The two packages and contents were then offered in evidence, to which proffer the defendants, by their counsel, objected, because neither the packages nor contents was of the res gestae, was no part of the representation and was not a token of a public character, or of such as was calculated to, intended for, or capable of deceiving, and because irrelevant and immaterial.
Fifth Exception. Which objection was overruled by the Court, and defendants, by their counsel, then and there excepted.
The witness Garrett then said the package was unwrapped after weighing by spring balances. He came up with a brace in one hand and a spring balance in the other, and as he reached down to get the brick, he said, "Now we weigh him." I said, "All right." So he took the balances, and his first effort was to lift it up in front, but it was more than his grip permitted; so he stood almost astride of it, and he could not carry it from the ground much. So I had to get right down on the ground to see the figures, and I took my pencil and followed the dots, and said, "95, 96 pounds." He said, "Let's try him again," and with that he pulled it almost up again, and I counted, "93, 94, 95, 96 pounds." Then he said, "We will weigh the other one." And then he got in the correct position, and we weighed the other one, which weighed, as I remember, 95 pounds. While I was figuring, he was down on the ground unwrapping the package, took off the oil cloth, then the flannel. The packages before me are the identical ones which he showed me on this *Page 612 
occasion. I notice the same mark now upon one that I noticed then. After weighing both of them, he then unwrapped one, and he looked at it, and I went right down on the ground and said, "Is that thing gold?" I looked up at him, and he said, "Pure gold, 22 karat fine." I said, "My God, it's a pretty thing as I ever saw in my life." He said, "Ain't it pretty?" And just in that attitude, as he sat there, he was putting his bit into the brick, and said, "Now we bore him." I reached out my hand, and I heard a voice in the woods some little distance say, "Throw up your hands." The miner Thompson heard something apparently, and with the brace in his left hand — whether he dropped the brace or not I do not know, but with his right hand he went into his coat pocket; I sprang at him and said, "What's the matter?" He asked me, "Did you hear something?" I said, "No, not a thing," and he said, "I thought I did." I said, "I heard nothing." I said, "Give me the brace now, and let's bore this and get out of here; there may be somebody prowling around here," and so he took his hand out of his pocket. I got astride of the brick again, the one on the ground. I did not have the brace and bit in my hand, but just at this point I held my hand out for the brace; then a voice very much more distinct and penetrating says, "If you don't drop that, I will put a ball through you." That was a voice back in the woods. The Indian in the meantime was keeping up quite a chatter. I didn't pay any attention to the Indian. As soon as he heard that remark, he again sprang up and went into his pocket again. As soon as he did, I sprang at him and caught his coat, and held it down so he could not spring his hand out. I said, "My God Almighty, there's one behind every tree in these woods! Man, you have played a mean trick on me! You have fooled me away from home up here, where we are surrounded by officers." He said, "I didn't do it." About that time a man ran up and came around behind me, and laid his hand upon the man and began feeling his pockets, *Page 613 
and all up to his face; seeming to be satisfied with his search, quick as thought, he turned around to me and said, "What's your name?" I said, "My name is Garrett." "What are you doing up here, anyhow?" He said, "That makes no difference; I am an officer, and I command you to take charge of this man?" "Me take charge of him?" "Yes." "Suppose he tries to run away from me?" He says, "If he moves a finger, shoot him." That was Mr. Patterson.
Sixth Exception. (Counsel for defendants object to any further evidence of the acts or declarations or conduct of the defendants being detailed by witness, after the approach of Officer Patterson, who then and there put the defendant Thompson under arrest. Objection overruled. Exception.)
At this point I realized that the officer had not disarmed the man, and that he evidently was armed, so I felt that it was prudent to let him see that I was protected, so I brought my rifle into evidence. I held him there, and in a few moments another officer approached. Another man came up and began to search him, getting everything out of his pockets. Finally he took out a pistol from his breast pocket where his hand had been. As he disarmed him, I released my hold, the officer had him under his gun; another one had a handcuff on him.
Seventh Exception. Here defendants, through their counsel, moved to strike out the evidence just detailed by the witness, because it relates to facts and circumstances occurring subsequent to the termination of the alleged conspiracy, and is not of the res gestae, which motion was denied by the Court, and defendants then and there duly excepted.
At this time I do not know if the Indian had been arrested. I saw an object; I could not identify the object. I saw it moving around. I recognized a lot of black hair.
The hair which was produced and shown to the witness, was long and black, and affixed to a false face resempling [resembling] that of an *Page 614 
Indian, which the witness identified as being that worn by the defendant Daley at the time of his arrest.
Mr. Patterson took off the headgear, and also a beaded buckskin jacket from Mr. Daley.
Eighth Exception. Here counsel for defendants moved to strike out all the evidence given by witness with respect to the explanation and identity of the Indian garb, alleged to have been worn by the defendant Daley, and taken off of him at the time of his arrest, as detailed by witness. Motion denied. Defendants except.
I saw Mr. Daniels make a move to take something from the miner. Mr. Daniels took a card, I think from under the miner's foot. Some words passed then.
Ninth Exception. Defendants' counsel here moves to strike out the evidence with respect to the card, as detailed by witness. Motion denied. Defendants except.
The card read Henry D. Hawley, Hotel Guilford; that is one of the defendants. The two defendants Thompson and Daley were then arrested and brought to town.
"My purpose and intention after the interview with Thompson, in which my suspicion was aroused, was to come to Greensboro, and, if the proposition which he was making me was a legitimate one and truthful, to trade with him; but if it developed that the whole scheme was a fraud, and their purpose was to cheat and defraud me, I proposed to turn them over to the legal authorities, and have them punished."
CROSS-EXAMINATION OF PAUL GARRETT.
Being cross-examined by Mr. Gilmore, the witness said:
That he is 38 years old, six feet tall, weighs 205 pounds, of common school education; been engaged in the manufacture of wine since he was fourteen, and since 1890 has been at the head of the concern; that the annual business ranges from $100,000 to $150,000; that he employs about forty people; that the moment he first met defendant Thompson, *Page 615 
he was dictating to his stenographer, and that by invitation Thompson waited until he was through.
It puzzled me to know how he got into my office. I spoke to him about five minutes, and asked him what his business was, and he said he wished to see me privately. I don't recall what I said to him, but he insisted on seeing me privately. Do not remember his words nor mine to him, but we went through the shipping room and on to the outside of the building, a distance from my office of 60 to 75 feet.
Up to this time he had said nothing as to what his mission was. The first thing he then asked me, if I had a brother Andrew Garrett, and I told him no. He said he was sorry, that he was looking for Andrew Garrett's brother. As we talked I looked straight at him. I told him I had no brother; never had but one, and he died in infancy. He said that Andrew and he had been partners in Arizona, and that about four years ago Andrew had come back to his rich aunt, living in Charlottesville; that she had written him a letter, and he had come back to look after her property; and before he had left he and Andrew made a bargain that if either one of them ever run upon anything (I can not give his exact expression, I will do my best at it) that they would let the other know. That he had come to look for Andrew, but found that Andrew was dead, and his aunt had gone away; and at Charlottesville he was told that there was a man at Weldon named P. Garrett; that he knew Andrew had a brother named Peter, and he thought it was him, and he had come to look and see if it was so, and he was might sorry that I was not Andrew's brother. I told him no, that my name was not Peter, that it was Paul, and as I could not serve him, I was busy. He said, "Looked like nobody didn't want to talk to him anyhow; he wasn't after no money; had plenty of money;" and with that he exhibited his roll of money. A little purse with a lot of money. It was a leather purse with *Page 616 
a number of large bills, some in denominations of $100, and there seemed to be several of them. He made the impression on me that he was not after money. He said he was not after money. He then took up the question of being a poor ignorant man; that he could not write nor read nor figure. He then said he was looking for Andrew's brother to take Andrew's place — to take Andrew's interest; that he and Andrew had bargained that if he was ever rich he would take him in. He wanted Andrew's brother to look after the business of the enterprise because he (Thompson) was ignorant. I told him I did not see what connection I had with it; that I was not Andrew's brother. Up to this time I had not become interested in the matter. He represented that he was mighty sorry; he didn't know what he would do; that he could not find Andrew's brother nor Andrew. I told him I didn't know what he would do either. He then said that he had met a man on the train who told him I was a good man at figures and honest. I told him I tried to be.
From what he said, I gained the impression that I might take Andrew's brother's place, and I told him that if it came to a question of business consideration, I was open to any business proposition he might see fit to make. He stated that they wanted some good man; that the job was going to somebody, and that if I didn't take it, somebody else would. He said he needed a man that could read, write and figure, and was honest.
Up to this time he had no opportunity to know that I was such a person; he said he wanted such a party. I asked him what there was in it, and that he might ascertain regarding my competency and honesty from my partners and the business men of the community. He then repeated substantially what he had said about Andrew's brother, and that he had found this man before in Arizona, and that he was on his way east for the specific purpose of purchasing mining *Page 617 
machinery and taking out a patent on his mine; that he needed somebody to go with him to Philadelphia, and he thought that I would answer; he explained that they had previously worked the mine with Indians — six squaws, no machinery, that it was machinery he wanted to arrange for; that he had found the mine about two years ago; that the equipment he had operating in the mine was not sufficient, that he wanted to get machinery; that he had none; he then practically enumerated all the machinery he wanted; spoke entirely familiar of it; for that kind of stuff; I told him I would have to rely upon him as to the place where and the equipment to be bought; he then made me a proposition as to my services in connection with the enterprise; he offered me one-third (1-3) interest in everything he had, mentioned the two bars of gold. I told him that there was nothing material in that, and that ordinarily I got something for my services, and that I should expect my expenses paid and a remuneration of $25 per day. We came to the agreement that I should have my expenses and $25 per day; that was our contract, with the one-third (1-3) interest. I was only to give my services as consideration; the $25 per day was to cover the time that I was absent from my business, going to Philadelphia and Washington, or to Arizona, and the one-third (1-3) interest on the confirmation of the Indian; so far as Thompson was concerned, we made the agreement. The $25 per day and expenses was to apply only to the time that I was neglecting my own business for the other, absence from home caused by the work pertaining to the gold mine and the purchase of machinery. The business management was all I was to give for the $25 per day, and the one-third interest; I don't consider I was receiving a double compensation; it was the compensation he and I agreed to. He then paid me ten ($10) dollars on account of expenses in good money; I suspicioned it as bad money at the time he gave it to me, but *Page 618 
took it right down to Mr. Smith, cashier of the bank of Weldon, and he said it was good money.
Thompson first called on me about 9 o'clock a. m.; was there about two hours, when he left, walking back to the station. As he departed to return to the depot, I called the attention of Mr. Cole, my bookkeeper, and another employee in the office, to look out of the window, saying, "There goes a gold-brick man." We all three observed him a couple of minutes, all took a good look at him. I suspected as soon as he mentioned the Indian and the gold brick hidden up there in the woods that he was a gold-brick man; that was before he paid me the ten ($10) dollars. I had suspected that this transaction was fraudulent before he paid me the ten ($10) dollars. I have never returned it. I did not return it after I knew it was good money and suspected the transaction was fraudulent, because I expected to go to Greensboro. I retained it to defray expenses to watch developments in the gold mine scheme. It was mighty pretty, and I thought possibly there might be something in it. I may have been something of a phantom chaser in this transaction. I went down to the depot to the 11:30, when I showed Mr. Smith the ten ($10) dollar bill, and later met Mr. Thompson at the depot shed in Weldon, where he was waiting to take the train, and after suspecting his story I had a conversation with him, we went over the ground practically again and discussed quite a number of things; we made arrangements regarding the machinery and figured it out, I professing still to be his partner, meaning to carry out my part if figures had truly represented facts. I proceeded further to honestly carry out my part of the contract by making arrangements to come to Greensboro; by arranging my business so I could be absent from home a good while; left instructions with my assistant as to what should be done during my absence if I should be gone over two or three days, and *Page 619 
made those preparations which I ordinarily make when being called from home on business; and made such arrangements in an honest endeavor to carry out my part of the contract. Had a conversation with Mr. Smith regarding it; introduced Mr. Smith to Mr. Thompson at the shed. While talking with Thompson, I went into a saloon for a pencil to figure up the machinery, returned and waited with him until he left on the train. There was possibly an exhibit between him and me of the telegrams I had written; possibly I asked him to show me which one meant for me to come, and which one not. My memory is faulty at times. I talked with him twenty or thirty minutes at the shed; saw him take the train, and after he had, I hung around the shed for a while and went home, and proceeded to attend to my business affairs until the arrival of Mr. Lewis, whom I had telephoned, after Thompson left my office and before I went to the depot. I said to him over the `phone that I had a matter of importance to consider with him. He arrived about 3:30 p. m. I explained the matter to him. That afternoon I wrote a telegram to the Chief of Police at Richmond, Va., that I had a gold-brick gang spotted, and wanted him to send me a detective to the Monticello Hotel, Norfolk, Va. This is in the afternoon of the 20th day of March, 1901, that I have reference to. The same day I first saw Thompson. Up to this day I had not seen or heard of any of the other defendants in this case, except the Indian. Mr. Thompson told me in the first instance that he had an Indian associate; that together they were interested in this transaction.
I went to Norfolk the morning of the 21st, leaving about 4 o'clock in the morning; bought a piece of property approximately of the value of $40,000; I paid $1,000 cash, and up to that time $1,250 note, and made other notes of $1,250, each payable monthly; don't remember the exact amount of unpaid purchase-money; but think it cost in the aggregate *Page 620 
about $70 for revenue stamps on the deed and mortgage. When I left home, I took $75 with me. I left Norfolk for Greensboro by way of Weldon, traveling on mileage, and, including the sleeper and hotel bill I had to pay at Raleigh, I think it would have exceeded ten ($10) dollars. I drove out to the house of Mr. Mims on the evening of March 20, 1901, and asked him to come to my office, which he did, and I wrote a letter on the typewriter, single spaced, over two pages long, addressed to Mr. Patterson; starting with an introduction of Mr. Mims, accompanied by a letter of introduction from Mr. Lewis, and requesting Mr. Patterson's assistance in the apprehension of certain men, whom I had reason to believe were criminals, saying I that day had a call from a man, describing him and giving his name, and repeating nearly as one can in a typewritten letter some of the characteristic remarks that he had made, and as nearly as possible in the language he gave, describing him so that he could know him. I then outlined to him the leading impression that the man had left on my mind by his conversation, including the impression of the many possibilities that there might be something in it, but that the preponderance of the evidence made me believe he was a man whom it was my duty as a citizen to apprehend and bring to the bar of justice, and I asked his assistance in doing this. The greater part of the letter was devoted to a description of the conversation between us, and the programme and plan outlined by miner Thompson; in order that Mr. Patterson's judgment might be used with some discretion. I told Mr. Patterson that the letter, as written, would no doubt sound pretty fishy; that I placed myself entirely in his hands for him to protect me, if the following out of these plans developed into danger, and that in the event of any emergency or necessity for action, that I hoped he would not stand for a moment, but shoot straight to the mark, and be sure to hit the right *Page 621 
man. I mentioned my suspicion that possibly there was some reward for the Withers gang, and that in such event I proposed to deal liberally and not be hoggish about the matter. But I impressed on him that the prime consideration was not reward, but was to carry out what I thought to be my duty as a citizen, and to bring these men to justice if it should develop that they were crooked. I meant to be liberal, and I would not claim all the reward, meaning to divide such reward as might be obtained with Patterson and others; that I could not give to myself all the credit of any remuneration that might come. I think I said that the reward in the Withers case was very large, my impression at that time was, it was for $20,000. I did not mention any sum in my letter.
I signed, folded and gave the letter to Mr. Mims, with $20 or $25 for expenses. I directed that he read the letter for his own guidance, and deliver it to Mr. Patterson, and to be governed by his advice. My conversation with Mr. Mims before his departure was about five minutes. I heard from Mr. Mims by telegraph at Norfolk the next day, which telegram read: "Men are located; arrangements complete." Arrangements had reference to my protection. I thought I was up against a pretty hard proposition; I didn't want to be carried out into the woods and to be butchered; I went up against the proposition with suspicion that it was crooked before I accepted the ten-dollar bill. I thought when I called my stenographer's and clerk's attention to look out of the window some 70 feet away and observe a gold-brick man, that he was a fraud; and thought it pretty strong, and was under that impression when I took the ten-dollar bill down to the bank and had it examined, and had the same impression when I sent the telegram to the police of Virginia, the next day. The protection I thought Mr. Mims would arrange for me at Greensboro, was firearms. Upon my arrival at Greensboro, *Page 622 
I met Mr. Mims and Mr. Patterson before starting with Thompson to the woods where the supposed Indian was. Patterson told me he had communicated with the Sheriff, but no papers had been issued. It seems that the magistrate thought it was too thin a tale. Patterson told me this. Mr. Patterson told me that he had turned my letter to him over to the Sheriff, and that there had been considerable consultation over it, and that the Sheriff had taken the advice of attorneys, and that the matter had at that time been submitted to the Justice. I talked with Mr. Patterson pretty plainly for about thirty minutes before leaving for the woods with Thompson.
Upon my arrival at Greensboro, Mr. Thompson met me at the depot, and he walked with me up to the McAdoo House; sat down with me in the corridor; had quite a long talk, going over the ordinary discussion. He wanted to know where I had been and what I had done; I asked him which way we were going, how long it was going to take to get there, which direction it was from there, if there was woods around here sufficiently thick for an Indian to camp; and he told me that we would get enough borings from that brick, after it was melted down, to make a nice ring for my wife, and one thing and another; he said that at the time, and he said the same thing at Weldon; said I could use the borings for that purpose; he was going to give them to me. We talked of the expense of the trip to Philadelphia and Washington, and as to whether he had money enough to defray the expense. He handed me his money to count, and asked if that was sufficient to take the trip contemplated to Philadelphia and Washington; I told him it was.
It was my intention during that conversation to take the train and go to Philadelphia; but that was not altogether my reason for wanting to know if he had sufficient money to defray the expense; I told him at the time he would have to *Page 623 
loan me something to pay my hotel bill before we could leave; I asked him for no specified sum; he did not refuse to let me have any part or all of it. I had some accrued compensation up to that time. I didn't talk with him as to an advance on account of compensation for time already devoted to the scheme; I didn't make the effort, because I did not want to pull his leg too hard at once; thought it would create suspicion; had not at all changed my mind. Have not made any demands on him for money at all. I entered a suit here, don't remember the amount; I think I swore to an affidavit in the suit brought against these defendants, but can not recollect positively; that is my best memory in that instance. Referring back to the instance of bringing suit, I can not recollect the amount I sued for; might get it by reference to the papers, but not to my mind; I think it was a "claim-and-delivery" suit for breach of contract. I was trying to recover a certain amount of money that they had in their possession. The defendants had a contract that I was trying to recover; I had not made any demands on them for the performance of the contract. My memory refreshed by my signature to the affidavit before John J. Nelson, Clerk of the Superior Court, on the 23d day of March, 1901, that I there swore that J. L. Howardalias Frank Thompson, A. L. Daley alias Gonez Bono, and H. D. Hawley were indebted to me in the sum of $2,000. I put that as a light estimate on the mine, one-third interest in which I was suing them for — one-third interest in this gold-mining property. I attached everything in sight that belonged to them; the suit is still pending. I claim they are indebted to me. I rest upon the paper — $2,000. Thompson represented to me that there were two gold bars at Greensboro, worth $36,000; two others in Arizona, worth about $48,000, and a gold mine in Arizona worth millions. I thought my claim was very reasonable. I had a third interest. I had never met or talked with defendant Hawley before I brought the civil suit; I involved *Page 624 
him because they all seemed to be in the gang. I involved Daley because I had a telegram with his assent to the contract. It was the telegram Thompson sent me, "Gonez willing." He was to confer with him, and wire me if he was willing. That telegram said nothing about Mr. Hawley. I involved Mr. Hawley in that suit because I was playing for all in sight. That civil suit is still pending, as I understand, and I understand that property of the defendants was seized under the process in that suit; but I do not know what the property seized is, and don't know as a matter of evidence what property was seized under that process. I got possession of the newspaper clipping I have read from and offered in evidence from Mr. Brooks or Mr. King, or some of them. After the attachment, I retained Messrs. King and Kimball to bring the civil suit for $2,000, and advised with them about it. Immediately after coming from the woods, I drove to their office and retained them to appear in this case. They are the first lawyers that I saw in connection with this matter. I did not know when I first went to their office who the State Solicitor was. I did not find out who the State Solicitor was until after supper, when I was introduced to Mr. Brooks as Solicitor. This civil suit was entered at 2 o'clock in the night. I do not know who went on the attachment bond in the civil suit. I have no recollection. My recollection is that Mr. Mims went on the bond; don't remember requesting anyone else. The papers were ordered in Messrs. King 
Kimball's office after 12 o'clock at night. I heard the examination of the defendants before magistrate, which concluded about midnight. I went to the woods the same day I arrived at Greensboro, and went to the office of Messrs. King Kimball on the same day and sued out the attachment for $2,000 on the night of the same day; I was willing to get $2,000 if I could. When I arrived at the woods Thompson brought out two packages, both done up in *Page 625 
flannel oil cloth, and bound with a shawl strap, and we went through the process of weighing them; remember weighing each one of them, down on my all-fours with pencil and paper in my hand to set down the weight. I stood up between their weighing sufficiently long for him to change the scales from one package to the other. It is not true that while weighing the second we heard a cry, "Hold up your hands, or I will shoot." Mr. Patterson came up toward Thompson and I stood, caught Thompson by the arm and said, "You are under arrest"; I then said to Thompson, "This is a mean trick you have played on me to get me here away from home in a strange land, and get me arrested." Patterson then turned to me and said, "What's your name?" I said, "My name is Garrett." "What are you doing out here? You got nothing to do with this." I was scheming, I was matching my wit against his. He says, "That makes no difference, I am an officer, and I command you to take charge of him." At this time Thompson had put his hand in his pocket, as if to draw a weapon; he had not drawn it. This was after the cry of someone, "Hold up your hands, or I will shoot you." I pulled a gun I had in my right outside coat pocket. But I had that gun out before Mr. Patterson came there, a few minutes, I suppose, when I was holding out my hand for the last boring. I am right-handed; don't think I could have missed him that close. I tried to keep up with Thompson's lies. The only difference was, he lied straight to taw, I tried to serve my purpose better. Don't think I had to lie to him. I took the gun in my right hand out of my pocket, and held it a little back of me, and the officer said, if you don't drop that gun I will put a hole through you. Thompson said, "Officers!" I grabbed him, and said, "For God's sake, don't pull a gun, they will shoot us to death." It was a Colt's revolver, nickel-plated. When I made this remark to Thompson, the gun was in my hand behind me. I brought it into *Page 626 
evidence. Patterson had not robbed him of his gun; I thought there was one there, but I had not seen it up to this time. I saw Deputy Sheriff Weatherly take a gun from Thompson's right inner pocket of the lapel of his coat. I had my gun in my hand at that time; had had it there for awhile. I do not remember that I was frightened as we approached the woods; I remember a wagon passing us on the way, and stopped for a drink. Thompson acted afraid, and I insisted that there was nothing to be afraid of, that I was going on. I invited him more than once to proceed on. At the time Patterson came up, he had the brace in his left hand; his right hand in the right lapel of his coat. I was mistaken when I heretofore said that his right hand was under the left lapel of his coat. I don't think that Mr. Weatherly took a gun from his right-hand pants pocket. It was taken on Mr. Weatherly's search; Mr. Patterson made a brief search around his hips, but did not get as high as his coat pockets.
I wrote the Attorney-General of Virginia to know the reward offered for the Withers gang. This was after I returned home from Greensboro. If there had been a reward, I would not have hesitated to accept it. It was my purpose to divide the reward with those that assisted me. I felt that it was too delicate a matter to approach gentlemen with, to offer them a fee for services of that nature.
At the time of Thompson's arrest in the woods he asked me a number of questions, but I only replied to the last one, knowing that he would have an opportunity to ask the same in the court-house. It is not my recollection that he there said to me that he had not asked me for any money, or that I replied to him, "No, he had not, but that I had ten dollars of his money and would get more," that such in substance was not said at that time. Mr. Thompson said at the McAdoo House that he would pay all expenses. *Page 627 
Q. Don't you know at that time you told him you had no money with you?
A. I told him I would have to borrow some money.
Q. Didn't you say to him that you would have to borrow some from him?
A. I think I did.
Q. And that was before you started to the woods?
A. Yes.
Q. Were you telling the truth?
A. I think I had a little. I didn't want to be taken up. I explained to him at the McAdoo House, when I counted some $340 of his money, that I had become indebted at Norfolk, Va, and the character of the indebtedness. I have retained Messrs. King Kimball to assist in this prosecution; so retained them the evening of the arrest. Before I knew that the Solicitor was in town.
Q. Do you regard yourself responsible for this prosecution?
A. Not at all. I explained to Mr. King that I was in the hands of this people; that I had carried this thing as far as I could.
Q. Have you said to anyone what you would do with the money realized in this civil suit for $2,000?
A. I think that is the only time I have made any direct statement. I proposed to get some little souvenirs for my friends who had assisted me.
Q. Isn't it a fact that at the time you pulled your gun down and levelled it on the defendant Thompson in this case, that you had no positive information from any source that Mr. Thompson had told you an untruth?
A. I had reasonable ground to believe that it was an untruth. I had no positive knowledge, but thought it was a fake. *Page 628 
Q. Relying on that same judgment of yours, didn't it dictate to you the same thing when Howard was talking to you about this matter in your office?
A. Not so thoroughly.
Q. As he departed from your office, and at the time that you called the attention of your stenographer and clerk to the appearance of Thompson, did that same judgment of yours convince you that this was a fraud as at a later time?
A. Pretty much so.
Q. And the same day you took that $10 bill to the bank?
A. Yes.
Q. And the same day you telegraphed to the Chief of Police at Richmond, Va.?
A. Yes. The preponderance of the evidence was in favor of the fraud.
RE-DIRECT EXAMINATION OF PAUL GARRETT.
On re-direct examination, witness identified two satchels found in the woods at the time of the arrest, and the same were offered in evidence.
DIRECT EXAMINATION OF J. F. JORDAN.
The State, to further prove its case, produced and had sworn J. F. Jordan, who testified in substance as follows:
My name is J. F. Jordan; am Sheriff of Guilford County; remember the occasion of the arrest of Howard, Daley and Hawley. My first information of the matter was on the 22d day of March, about 12 o'clock, when Mr. A. C. Patterson came into my office and gave me a letter, which I read. I went to the telegraph office and saw Thompson about 1:15 p.m., on Thursday, the day preceding the arrest; he was sending a telegram when I went into the office. He had on a flannel shirt, which looked as though worn for some time, and a kind of brown suit, and rather full beard, rather ragged; *Page 629 
and a crushed hat, light colored. I heard the operator read the telegram over to him, which was addressed Paul Garrett, Monticello Hotel, Norfolk, Va., and read, "Gonez willing; come tomorrow." It bore a cross-mark on it in blue pencil. Thompson then came out of the telegraph office and went into the hotel Guilford; left there ten minutes later. I next saw defendant Hawley at the hotel Guilford with Thompson; he went out at the same time. They had at that time a little conversation, and then separated, Thompson going down street and Hawley going back to the hotel. I came back to my office and remained a little while, and then I went home to dinner and came back and spent most of the afternoon driving up and down the main street here, stopping now and then and loitering about. I permitted Mr. Weatherly and Mr. Mims to aid me in tracking these men. After Thompson and Gonez left the hotel, I saw him and Gonez conferring together that afternoon once or twice before night upon the street near the McAdoo House, the first time on the opposite side of the street. I saw no further conference between the defendants until the next morning. The next morning I saw Thompson, Hawley and Gonez in conversation three or four times before the arrival of the train from Raleigh, at 11:55. Their conversations were always more or less secret and suppressed; they seemed very anxious in their movements in anything they had to say to each other for about an hour before the arrival of the train referred to at 11:55, they were from the McAdoo House to the depot, and most of the time they were about the platform at the depot. This was the train Mr. Garrett came on; they were there when the train arrived. For a few minutes before the train came, Thompson was standing before the entrance for white people at the main depot, with his back right up to the wall; Hawley and Gonez were further down to near where the street crosses the railroad; they were near that point. There was *Page 630 
a large crowd down there, and they were moving about in the crowd. Hawley and Gonez Bono were together; that was the position when the train came in. I did not know Garrett, and I was watching who Thompson would go to see when the train came in. He walked up and met Garrett about one-third of the way from where the train was standing. Thompson and Garrett walked into the waiting-room and had, I suppose, five or ten minutes' conversation. They then got up and came out of the waiting-room, turned around the corner by Scott's store, and started up the street; next came round on the other side of the depot and kept on the opposite side of the street from the one that Thompson and Garrett were going up, and they went about 30 or 40 yards behind Thompson and Garrett to the McAdoo House. Garrett and Thompson went into the McAdoo House and took a seat on a bench in the lobby, just outside the desk. Gonez walked beyond the depot to where Washington Street crosses South Elm at Scott's store, and took a stand there round the corner of the building, and was watching the McAdoo House. Hawley got into a stairway leading up into one of those buildings right opposite the McAdoo House, occasionally coming out to where he could see and then retreating. I walked into the McAdoo House and saw Garrett and Thompson in conversation, sitting there on the bench. I sat down a little while, and then got up and went into Holton's drug store, and watched the movements of Hawley and Garrett; one was standing there watching from the corner, the other was in the stairway. When Garrett went up to dinner, I went to dinner; returning at 2 o'clock, I drove in my buggy down and stopped a little north of J. W. Scott Co.'s store, walked on down to Holton's drug store and went in. I saw Thompson drive up to the McAdoo House in a buggy and stop, and I saw Garrett come out and then get in the buggy. I am pretty positive that Hawley went across the street and said something to Thompson at that time; Thompson with his *Page 631 
buggy was on the street. After they went off, I went to my buggy as quickly as I could. I did not know exactly where they were going, but I had a fairly good idea, knowing the country as I do, from the way they started. I drove down to Ogburn's livery stable, where Patterson was to meet me, in case they should start out in the woods anywhere, and as I drove into Davie street, Gonez came up driving very rapidly the old horse that I knew very well belonged to Mr. Vanstory's livery stable. He drove on very rapidly until he got to the depot, and some freight trains crossing the street detained him a few minutes, and made him very restless and nervous. Finally, he got across, and I saw him going pretty rapidly up Ashboro street. In the meantime, Patterson came up. I told him what I had seen. We got into the buggy and started off, and I think the first sight we got of them was just before we got to the late Judge Settle's residence. We saw Thompson and Garrett in the buggy, and Weatherly and Mims riding on horseback some two or three hundred yards behind them. We went on in that position until we got about two miles from town, and at ......... place, just about 2 or 2 1/2 miles from town, Thompson stopped his horse, got out and went up to the well and got a drink of water, and when he stopped his buggy and got out, Weatherly and Mims stopped their horses. I then whipped up my horse and drove up rapidly, without stopping as I passed them, said "For God's sake, men, turn and go back and don't stop here." They turned round and went on, and then I drove on as fast as my old horse could go, right by Garrett and Thompson at the well, and some three hundred yards, I suppose, across the creek. When I got across Buffalo Creek and looked back, nobody was in sight. I stopped my horse and remained there some three or four minutes, and looked back and saw Thompson and Garrett turn off and leave the main road, and drive rapidly through a body of pines, leading *Page 632 
round down Buffalo Creek; drove my horse over the road, went back across the creek and Weatherly and Mims were then in sight. I beckoned them to come on. They rode up pretty rapidly to me. Weatherly and Mims turned off the road, then following the tracks of the buggy that Howard and Garrett were in. I took Patterson with me and went right down the bank of Buffalo Creek, and when we got about 200 or 300 yards down the creek, I saw the buggy that I saw Gonez leave town in, hitched to a tree. Immediately beyond that was a pretty dense thicket; bamboo vines, grape vines, blackberry briars, and all such stuff. Patterson and I had not advanced more than 20 steps beyond where that buggy was hitched before we heard conversation going on in a very exciting manner. We remained there a little while and listened to it, as long as I felt safe to do so. There was only one doing that kind of talking, but the other was in conversation a little beyond, some 20 or 25 steps, I reckon. Patterson went down the path and turned into the thicket, and I turned into the thicket and went immediately to where I heard the conversation. We did not make any noise as long as we were in the path. The leaves were very dry, and, in fact, my hat fell off, and I made some little noise, and when I got in some 25 paces of where Gonez was located, he rose right up and started toward me, using this peculiar language, and I covered him with my pistol, and said, "Throw up your hands, or I will shoot you, and I have the authority." First, he did not throw up his hands. The second time I commanded and said, "Throw up your hands, or I will put a ball through you." When I said that he went down on his knees. I advanced rapidly, where I could see him well, keeping him covered with my pistol. "Now, if you move a hand or muscle, I will kill you," I said; "Close in, men." I did not know how many were around. I had my deputies surrounded, and I wanted to get all I *Page 633 
could. About that time I heard Patterson get up to Thompson and Garrett, and I could not from the distance I was at, and in the excitement and confusion, I could not tell exactly what they were saying, though I could hear them and see them. After I had hollered at the deputies to close in, and after I saw Weatherly and Mims get up to Garrett and Thompson, then I did not suppose anyone else was in there, as they had come in without stopping anybody. I hollered to Patterson to come to me; the excitement had kinder worn off then, and I saw Patterson was getting very near the Indian, and I let him go on until he got in ten feet of the Indian, and then I said, "There he sits right by you."
Tenth Exception. Counsel for defendants here objected to any further evidence as to what occurred after last statement of witness; because it appears by the witness' own statement that the alleged conspiracy was put at an end by the arrest of one or more of the defendants. Objection overruled. Defendants, by their counsel, then and there except.
I had just gotten up to the Indian. Patterson walked up to him and jerked his mask off. I found it on defendant Daley. He took off his mask, his beaded coat and red bandanna handkerchief. He looked like an Indian when he had his garb on. He was a very good representative.
(Two cases are here shown witness.)
I saw these cases when I went up to the Indian, before I put my hands on him; they were only a few feet from him.
Eleventh Exception. Here counsel for defendants moved to strike out evidence as to showing the cases because an act or fact not of the resgestae, immaterial and irrelevant. Motion denied, to which ruling of the Court defendants, by their counsel, then and there excepted.
The first sight that he got of the Indian was when he heard him coming; he rose up out of the brush. I don't know where he got his pistol from; he had it waving to me *Page 634 
when I first saw him. When the mask was jerked from him, he did not say anything. I then picked up the cases and this mask, I think both of these cases, and Patterson led the Indian up to where Garrett and Thompson were. I saw one of the gold bricks uncovered about like this now. I recognize it by the mark that was made on it at the time. It was 6 or 7 feet from Thompson and Garrett. I saw the brace and bit that was exhibited here this morning. I could not say that I saw the scales. I saw the episode between Garrett and Thompson about the card that Daniels got from under his foot; it was not under his foot, but it seemed that he was trying to stick it up his trouser's leg.
(The card is produced and identified by witness, and offered in evidence.)
Twelfth Exception. Defendants here objected to the witness stating anything in reference to the card taken from under the foot of defendant Thompson, or any declaration made by Thompson as to the same, as an act or fact occurring subsequent to the termination of the alleged conspiracy and arrest of one or more of the defendants. Objection overruled, to which ruling of the Court defendants, by their counsel, then and there excepted.
The signature on the card is that of defendant Hawley. I took the card and put it in my pocket. Patterson and I left and came back to my buggy, and left the others to bring in these that had been arrested. Patterson and I drove rapidly back to town. I left my horse standing at the depot; Patterson got out on one side of the street and I on the other. Just before we got in front of the Hotel Guilford, Daniels came up, and we all joined there just before we got to the Hotel Guilford, and Hawley was standing in front of the Hotel Guilford, looking down the street. Patterson, Daniels and I walked up to him, and told him to come into the hotel very quietly; he turned right round and we all walked in *Page 635 
together right into the reading-room, and sat down. I said, "You can consider yourself under arrest." I told him I was Sheriff of the County, and had a warrant for him. I showed him this card, and asked him if he knew it; if he knew anybody in Greensboro. He said he did not know anybody here, and he had never seen the card. I asked him if he had a room; said he did. I said, "Let's go to it." He, Daniels and I went up to his room, and picked up a case he had; it looked like a dress-suit case.
Q. What did you find in the first one?
Thirteenth Exception. Defendants object to any further evidence as to what was found in defendant Hawley's possession, or what was said to him by the Sheriff of the county, or anyone, in his presence at the time he went to his room, and before taken from the hotel while under arrest. Objection overruled. Defendants except.
Q. What did you find in the first one?
A. Went through the case and found nothing much, except his personal effects, clothing, combs and brushes, and articles of that kind. We took this, closed it up, and picked up another case in the room, kind of square case, and it was locked. I asked him for the key. He said he did not have the key. I asked him whose it was. He said it belonged to a friend of his who had gone to Florida and left it in his room. In the meantime, the keys were given over to us, and the second one we tried unlocked the case. I found this bag in his room, but it is necessary to state how it was found; I found it in the trunk of the Indian, when I examined it in the hotel, after I got possession of that trunk. We did not find that trunk that day. Late Sunday afternoon, as a matter of precaution, as I was the custodian of those people, I thought it best to search them. I went to the jail with my deputies and did so. I found a trunk check under the lining of his vest. I went to the Hotel Guilford, and after *Page 636 
some little search found this trunk in a back hall, in not a very conspicuous place, and I took possession of it, and went upstairs, and we searched that, and in the Indian's trunk I found that bag which you have in your hand. I found some things in this case; I found these blanks purporting to be assayer's blanks, and quite a number of typewritten letters.
These were offered in evidence, and marked Exhibit C.
These were typewritten communications addressed to Harry, or William, or Henry, and in substance all the same, and to the effect that the addressee had been reappointed to the staff of the mint assayers by the government at the mint at Philadelphia. I don't remember where I first saw one of these letters. I found some safe-keys, a good many bits, a dirk and bronzing fluid in the case belonging to Gonez Bono; bronzing fluid like that on the brick, and a lot of copies of Bradstreet showing all the banks in the country and portions of Canada; how the vaults were located, names of the officers and things like that; a very complete guide to all the banks of the country; railroad guides and maps, very complete, well gotten up and nicely bound. Bradstreet's Reports gives the rating of different men of wealth.
Fourteenth Exception. At this juncture, the defendants, through their counsel, moved to strike out all the evidence of the witness as to the acts and disclosures or conversations with any one of the defendants in the absence of the others; and any and all evidence of the witness relating to property belonging to any one or more of the defendants, which was by the witness discovered and investigated subsequent to the arrest of defendants in the woods, because the same is not of the res gestae, is immaterial and irrelevant. Objection overruled by the Court, and defendants, by their counsel, then and there except.
I remember two different sets of maps spoken of; one in *Page 637 
Hawley's baggage and one in the Indian's trunk. The Indian was stopping at the Guilford Hotel.
CROSS-EXAMINATION OF J. F. JORDAN.
Being cross-examined by Mr. Barringer, he testified in substance as follows:
I saw Howard with Hawley the day I made the arrest, a few minutes in front of the Guilford Hotel; people were passing at the time as usual; saw them down street further, that afternoon, standing on the pavement; saw them about three times the first day; once at the hotel, and twice in the afternoon; don't know if he was a guest at the Hotel Guilford, except that I saw him there and his name on the register. Went up to his room and looked in that case at the hotel. The next day after I came back from the woods saw Hawley go in the stairway opposite the McAdoo House. He went in and turned around and came out. He staid in there nearly thirty minutes, right inside the first entrance. He came from the depot about four or five yards beyond Garrett and Thompson, with a crowd that were at the depot. A great many people were going up the street on both sides. Hawley and Daley separated just before the train came in; saw them together just before the train came in at the entrance of the white ladies' place of reception. I saw Hawley by himself at the depot in a great crowd of people. Saw Howard and Hawley together at the depot, where South Elm street crosses the railroad.
I found three maps in Hawley's satchel. I saw him standing in the stairway between 2 or 3 o'clock. Don't know if Hawley and Daley had the same room at the hotel; I presumed they roomed together from finding their baggage together; that is, this assayer's case was in Hawley's room; don't know if it was his. I think I made a mistake about *Page 638 
their rooming together. I have been talking about Daley's baggage when I meant Hawley's baggage; I have been talking about this case when I was in Hawley's room. I will say I don't know anything about the room; I was mistaken about this baggage.
Being cross-examined by Mr. Gilmore, witness said:
Q. Were you present at the preliminary hearing of this case?
A. I was.
Q. I will ask you if it is your memory if Mr. Garrett was asked the question at that time, if Mr. Thompson didn't say to Mr. Garrett, "I have never asked you for any money, have I, Mr. Garrett?" And Mr. Garrett replied, "No. But I have got $10 of yours, and I will have more"?
A. I remember that there was something of that kind said; just what it was, I don't remember.
RE-DIRECT EXAMINATION OF J. F. JORDAN.
Further examination in direct by Mr. Brooks:
Said he never heard Garrett say that he had ten dollars of his money, and would have more, but he heard them have something like a quarrel.
In Hawley's room the only baggage I found was this case and Hawley's satchel, which he then disowned and declared having no key to, when urged he produced the key.
DIRECT EXAMINATION OF W. J. WEATHERLY.
To further prove its case, the State called W. J. Weatherly as a witness, who, being duly sworn, testified in substance as follows:
My name is W. J. Weatherly; I am Deputy Sheriff of Guilford County; have served 20 years as policeman and 3 years as Deputy Sheriff. Sheriff Jordan first intimated the presence of the defendants in Greensboro on Thursday, *Page 639 
March 21, 1901. I went on the street looking for the men, and saw Thompson standing against a store on South Elm street eating an orange. He looked rather rough; had on a sort of brown looking suit and flannel shirt; broad-brimmed hat his hair being longer than it is right now; beard all over his face, but not so very long — a good heavy beard. I saw him on the street several times that day — up and down the street — and think I saw him and Hawley together once or twice. The first time I saw them together about the Guilford Hotel, then toward the depot near Scott's store. I saw them together twice on Thursday in the afternoon; I saw Mr. Daley with Mr. Thompson once in the afternoon near where Jim West keeps on South Elm; they stopped, had a few words, and passed on down the street together. That is about the only time I saw them on Thursday. I saw them the next Friday morning; saw Mr. Thompson first; he seemed to be walking up and down South Elm street. Then I saw him and Mr. Daley in the morning the first time where the Benbow Hotel is building now. I saw them meet there; I think they stopped and had a little talk, and Thompson went on toward the depot and Daley came up the street. I saw Mr. Thompson on the street pretty regularly all the time up and down towards the depot. I was at the depot when the train came in on Friday, which Mr. Garrett came in on. Saw Mr. Daley and Mr. Thompson both at the depot, and saw Mr. Hawley at the corner at Clegg's. Mr. Thompson seemed to be standing back against the depot for awhile, just before the arrival of the train. Mr. Daley passed him two or three times up and down the platform, and would speak to him as he would go by; they made remarks to one another; just before the train came in, Mr. Thompson, who was walking up and down the platform, seemed to be restless, and Mr. Daley would pass him every once in a while; they never passed without they looked like they spoke, saying something to one *Page 640 
another. Hawley was walking on the platform part of the time, and for awhile stood back against the depot near the sitting-room door. I left him right on the corner. Cleggs' corner is just across a narrow street, not more than 20 feet from the depot. One standing there could readily see passengers leaving the depot. When the train came in and Mr. Garrett got off, Mr. Thompson spoke to him, and they went into the depot; I went in there, too, and they went over to the northeast corner and sat down and talked a little while there and came out; I followed along. Mr. Daley was then standing on the north corner of the depot, the one towards the railroad. He was standing on the platform of the depot at Clegg's hotel. I didn't see anything more of him until I came out. Mr. Daley went across the street, on the right-hand side of the street, and as Mr. Garrett and Mr. Thompson went down on the left-hand side of the street, he went down on the right-hand side, and Mr. Hawley followed along behind him. I was right behind him. Mr. Garrett went on down the street. He and Mr. Thompson went in the hotel. Mr. Hawley went down below a drug store, and went and stood up in a door. Mr. Daley came across and looked in the hotel, and went across to him and said something to him; then he went right up the street to Mathews-Chisholm-Stoud's corner, and stood around the corner. He stood there waiting some time. Mr. Hawley was right in front of the hotel, and Mr. Daley was a little further up the street, and could see the hotel. I saw him when he left the corner at Clegg's hotel. He came on down the street at a pretty good gait. The stairway he was standing in, the door opens right on the street; you come in, and it is some five feet, I reckon, before you strike the steps to go upstairs. He was standing right inside. I don't know what became of Mr. Daley at the corner; that is the last I saw of him, but Mr. Hawley stood there for awhile, round about, and after awhile Mr. Howard *Page 641 
drove up with a buggy in front of the McAdoo House. Mr. Hawley went across the street and said something to him. He had come on the outside of the door. He went across the street to speak to Mr. Howard. When he came back across the street, he was looking around, seemed to be very restless. I was standing looking through a window at him. He started in the house that I was in. I got under the counter. I told the young man if anybody came in there and asked for me to tell him he knew nothing about me. He came in the house and stood in there a little while, and went out. I was hid under the counter. This was Jim West's place of business. He went out, and I went to the door and looked out and saw him go into the shoe store. Garrett had come out and got in the buggy then, and started up the street. I had a horse over at Ogburn's stable right across the street. When he went in the shoe store, I went across the street, and went down there and got my horse; met Mr. Mims there. He and I got on our horses and rode the other way. Just as we got around the other way, Mr. Garrett and Howard came out of the lot where a livery-stable stood. We met them nearly face to face. We turned right down the street, and let them get on a piece. Mr. Garrett and Howard had gone on in a buggy. We turned down and came up to the court-house a piece, then we turned back and followed the buggy on out. We drove very slowly, and tried to keep back about the proper distance. About two and a half miles from here we came in behind a wagon; the wagon stopped, and for some reason or other the buggy was brought close to it. They stopped. Mr. Howard got out and went and got a drink of water. Mims and I were pretty close on them then. Sheriff Jordan drove right up behind us. He drove on by us. We got down then. They drove on then after they got their water. We followed on, then turned out to the left and went down through the pines. We went on down to the bridge *Page 642 
and met some other parties; dismounted and tied our horses; and Mims and I undertook to follow the buggy track through the old field; we followed it to the pines. There was a double track, but we didn't notice that until we came back. We followed one track to the road. We came to a different horse and buggy altogether, a horse that I knew very well, tied out there, and it was not the horse that I was following. We went back to the path, and took the other track, and went down and found the other buggy tied in the woods. We went down to the creek, I reckon probably 100 or 150 yards. I heard someone talking. The first noise I heard I couldn't understand at all. It was sorter of a j.. .. .. .. .. .. . Then I heard the Sheriff's voice. I knew his voice. I heard him holler: "Close in! Close in!" We went right in then, and I saw Mr. Garrett and Mr. Howard standing by a tree. Garrett had his hand on his shoulder. Howard was standing there with a brace in his hand. I went up to him and asked Garrett who he was. I think he said, "I am in charge of this man." I said, "You get away from here." At this time Mr. Garrett had his pistol out; at this time I saw one of the bars of metal.
Fifteenth Exception. Here defendants objected to any further examination of witness relative to anything done or said further, or subsequent to the time that the officers arrived in the woods and arrested any one or more of the defendants, because it is a circumstance occurring subsequent to the consummation or discontinuation of the alleged conspiracy, is immaterial and irrelevant and not of the res gestae, which objection was overruled by the Court; to which ruling defendants then and there duly excepted.
I saw a gold brick on the ground; there was but one open and another one wrapped up in a cloth that was opened afterwards. I know nothing about the baggage of this gentleman, that was at the hotel. I saw the Indian garb. *Page 643 
CROSS-EXAMINATION OF W. J. WEATHERLY.
Being cross-examined by Mr. Gilmore, the witness said:
I did not see Mr. Patterson at the time he put Mr. Thompson or Howard under arrest, but did soon thereafter. I participated in searching Mr. Thompson for weapons; I found a revolver in his pants pocket, and took it out myself.
Being cross-examined by Mr. Barringer, witness said:
People frequently located on the corner at Cleggs' hotel, where he saw Mr. Hawley standing. One standing there where he was could not see the passengers get off the train; when the train pulls in from the cast, it usually leaves the hindermost coach in full view of the street, so Hawley could have seen the crowd alight from there from the position in which he stood. I went down there to watch for Garrett, saw Howard meet him; there was a great many people at the depot walking about. Mr. Hawley was walking about.
RE-DIRECT EXAMINATION OF W. J. WEATHERLY.
Mr. Thompson had his pistol in his inside pants pocket on the inside; it was not in his usual pocket. I recognized Thompson on the street by the description I had of him from the Sheriff. I saw the letter the Sheriff had.
DIRECT EXAMINATION OF GARLAND DANIELS.
The State further produced Garland Daniels, who, being first duly sworn, testified substantially as follows:
My name is Garland Daniels: I live in Greensboro; I remember the occasion, the 21st day of March, the day preceding the arrest of the defendants; I was in town, but did not on that day see any of the defendants; I saw them on Friday; saw Mr. Howard first about 8:30 o'clock, when I was going to breakfast. He attracted my attention by looking *Page 644 
back at me, as he was quite a fine-looking fellow for a workingman. I kinder sized him up. I saw him no more that day. I saw Mr. Hawley and Daley on Friday, paid no attention to them at first; they looked at me as I passed them on the street, which did attract my attention very much. I watched them standing on the street together for some little time. I saw them two or three times in a door across from the McAdoo House, which is right across the street from my store. My office is in the window of my store, where I could, without trouble, look across the street. I saw them talking considerable; they would first go up to the corner around Shield's shoe store, and then to West's place. I saw them separate and meet at the doorway again. Howard put up a fine appearance for a farmer; he looked fine; he was walking with his hands folded behind him; had a beard then, and attracted my attention. Had on a kind of light suit, gray mixture of some kind; think he had on a soft shirt. I followed the party out to where they were arrested. I got there just in time to hear the Indian make a sound something like a dog barking. It was all done so quickly. I have seen this card before, marked Exhibit "B."
Sixteenth Exception. Here defendant Hawley, through his counsel, objected to the evidence relating to the card found at the feet of defendant Thompson, at the time the parties were arrested in the woods near Greensboro, because a matter occurring in the absence of the defendant Hawley and not of the res gestae, and is immaterial and irrelevant. Objection overruled by the Court, to which ruling defendant then and there excepted.
I got the card from under Mr. Howard's leg in the woods at the place of the arrest. Shortly after I came up they handcuffed Mr. Howard and Mr. Daley, and they sat down by a large tree, and were sitting there while Mr. Howard tried to put this card under his leg; I lifted his leg up and *Page 645 
picked it up, and gave it to Sheriff Jordan; there was on it "Henry D. Hawley, Hotel Guilford." I was then deputized to go to town, and I went ahead of the Sheriff, and Mr. Weatherly was to hold the prisoners for an hour in the woods. I passed the Sheriff and came to town; I sent my horse back by another gentleman and came up the street, and saw Mr. Hawley standing in front of the hotel; he was standing on the left of the door going up town. I passed by him and took my stand on the other side of the door and at the other window. He had a very nervous appearance; he was twisting his moustache and looking up and down the street, and seemed to pay no attention to me while I was watching him; he stood there some little time, and I saw Sheriff Jordan and Mr. Patterson coming up the street, and as they came up the street, I went in the ladies' entrance to the Guilford, and they brought Mr. Hawley in their door, and I followed them. They took him back in the writing-room and read a warrant to him.
Seventeenth Exception. Here defendants make a motion to strike out all the evidence of the witness relating to his own acts, or of the conduct or appearance of defendant Hawley, subsequent to the arrest of either of the defendants in the woods, as not being of the res gestae, and because it is immaterial and irrelevant. Objection overruled by the Court, to which ruling defendants then and there excepted.
Sheriff Jordan asked him if he knew anybody here; he said he did not. I asked the Sheriff to give me that card, and asked him if it was his. He said it was not. We then went up to his room. We found two cases there, one a dress-suit case and an assayer's case. When we got in Mr. Hawley's room, Mr. Patterson asked him whose things those were; he said the suit grip was his, as to the case, it belonged to a friend down South, and he asked him if he had the key to it; he said he didn't. Mr. Patterson asked him to give him *Page 646 
his keys; he did so, and he unlocked the grip and the case both. They then left the gentleman in the custody of myself. We sat in the room a few minutes; it was rather warm, and I insisted that we go down stairs. We went down in the office, and stood there for awhile. We left the office pretty soon. Mr. Hawley said he had taken a little medicine and asked me to go to the toilet-room with him, which I did. There Mr. Hawley reached in his pocket and pulled out this envelope; he tore it half in two. As he did, I grabbed him back of the neck. He threw this into the sink and grabbed for the chain. As he did, I grabbed him; in the scuffle, I secured the letter out of the sink. You can see it has been in the water.
Here the letter, marked Exhibit "D" was read in evidence. It was a typewritten letter to "Harry," suggesting that he had been reappointed by the United States Government to the position as assistant assayer at the mint at Philadelphia, and signed in typewriting ...................... Witness identifies another letter as being the same found in the assayer's case.
CROSS-EXAMINATION OF GARLAND DANIELS.
Being cross-examined, the witness said:
Before I went to the place with Mr. Hawley that he requested me to go, I had already taken this case from his possession; it had been seized by the Sheriff, and had been opened and the contents examined, not thoroughly examined. These letters were found in the case after it was thoroughly examined. The officer had taken it from the hotel and examined it for whatever was in it. I am not an assayist, and will ask Mr. Hawley to explain what an assayer's outfit consists of. While I do not know what an assayer's outfit consists of — the case had scales, acids of different kinds, and also a little bellows; that is all. I understand it is an assayer's *Page 647 
outfit — it may be something else. I could take an acid and test gold myself with it.
Witness was then asked the question, "What is exclusively used in an assayer's outfit that is not used in anything else?" when the witness remarked, "I don't know that you could find anything that could not be used for something else." And the Court said: "You can not examine the witness any further on this subject, as the witness has stated that he does not know what constitutes an assayer's outfit."
Eighteenth Exception. Here counsel for defendants objected to the remarks and ruling of the Court, as being an expression of opinion prejudicial to the defendants, and an undue limitation of their right of testing the witness' knowledge with respect to what the case and its contents were. Objection overruled by the Court, to which ruling defendants then and there, by their counsel, excepted.
BANKS BOONE, DIRECT EXAMINATION.
The State then called Banks Boone as witness, who, being sworn, testified in substance as follows:
My name is Banks Boone; I live in Greensboro. I remember the 21st or 22d of March this year when defendants were arrested. I was in town that day; saw Mr. Hawley. Was then working for Simpson Shields Shoe Company, situated diagonally across the street from the McAdoo Hotel; saw him after dinner. I was standing near the door, and the door was shut. There was a gentleman came in the store, said "Good morning," and slammed the door behind him on the inside. I walked up to him and asked him if there was something I could do for him. He said no, he ran in there to dodge a man. He stood around in there a few minutes, and I talked with him. I reckon he was in there possibly five minutes; then he turned around, looked over the store and *Page 648 
said, "This is a wholesale shoe store, isn't it?" I said, "Yes." He said, "I am a shoe drummer myself." We passed a few words, and then he went out.
HENRY WHITFIELD, DIRECT EXAMINATION.
The State then called Henry Whitfield as a witness, who, being sworn, testified in substance as follows:
My name is Henry Whitfield; I work at the Guilford Hotel; was there last March. Remember when defendants were arrested. Saw Daley in the morning, and he told me he wanted me to let him out; that he would be in with a buggy some time that day, and he wanted me to let him out. He went in to dinner; I held the horse for him. He got out, went in the house, got his satchel and came back and got in the buggy and went on out, and told me he would be back between three and four, or five o'clock, and to be there to let him in. I did not notice the satchels particularly when he came out with them; I did not notice what kind they were. That was the usual place for loading the baggage; we generally loaded the grips and smaller pieces at the front of the house. I kept the gate locked. He did not come back the evening he went out; he paid me a quarter. He was stopping at the hotel.
Nineteenth Exception. Defendant Hawley, by his counsel, in ample time, objects to the testimony of the witness, because it relates to conversation between the witness and defendant Daley in the absence of defendant Hawley, and because it is irrelevant and immaterial, and moved to strike out his testimony, which objection and motion was overruled by the Court, to which ruling defendant Hawley then and there excepted. *Page 649 
J. P. TURNER, DIRECT EXAMINATION.
The State then called Dr. Turner as witness, who, being sworn, testified in substance as follows:
My name is J. P. Turner; am coroner of Guilford County; reside at Greensboro. I remember to have seen and examined the trunk that Mr. Jordan spoke of yesterday, for which he got a check from defendant Daley, and opened it down at the Hotel Guilford. It was found, I think, on the day following the trial, the preliminary hearing. There was a research made, and this check was found, as I understand it, on the person of Gonez Bono. I examined it the same day it was found; the check was turned over to me. This was Saturday, I think, and at the same hotel where he was stopping.
Twentieth Exception. Here defendants' counsel objected to the witness testifying with reference to the trunk and its contents found after the arrest and incarceration of defendants, as not being of the res gestae, incompetent, irrelevant and immaterial. Objection overruled, to which ruling of the Court defendants, by their counsel, then and there excepted.
It was found at the Guilford Hotel, where Hawley and Daley were stopping. The trunk was a box arrangement; a strong box, well bound with iron, and had on it two locks, one at either end towards the end, not in the middle like an ordinary trunk. I suppose the trunk was about three feet long by eighteen inches wide, and about fifteen inches deep. The inside arrangement was in layers or trays. The first tray contained just simply some of their paraphernalia. I don't remember exactly what, a place built especially, it looked like, for these two cases that contained the gold brick, and there was a board there to wedge in between them so as to make them stationary so they could not move. In the lower part of the trunk I found quite a number of maps of *Page 650 
the Southern States, and some parts of Canada, the eastern part of Canada especially, and also some well-bound copies, parts of copies of Dun, a part of Bradstreet and Dun; I think this was Dun's part of it, bank reports, reports of the wealth of men throughout the country, and also all the bank officers, and the amount of shares that the different men held in banks. There was also in the bottom of this trunk, in different compartments, for holding this material, bronzing liquid, in fact a bronzing outfit, bronzing liquid and bronzing powders, together with two brushes in good order. Also quite a number of bits like this in here, like this part of it (showing jury). Some four or five, possibly more, of the new shawl straps you saw around the second brick that we opened here yesterday; there were four or more of the oil cloth covers like was around those bricks.
I saw no flannel wrappers or goods in the trunk. There was also some 12 packages of borings, which, on being tested, proved to be pure gold. I have studied chemistry, and am familiar with acids upon metal, and I say it was pure gold. I don't remember anything else in the trunk. The gold was fixed up in nice little paper, colored slightly, not exactly brown; packages 2 or 2 1/2 inches long and 1 1/2 inches wide.
J. P. TURNER, CROSS-EXAMINATION.
Being cross-examined by Mr. Gilmore, the witness said:
In the capacity of Coroner of Guilford County, I handled the writ in the suit of Paul Garrett against J. L. Howard; I served the paper; I levied upon the property belonging to these defendants; by that writ I levied on their baggage and the money they had on their persons, and such other effects as could be found belonging to them; I don't remember the exact amount of money, but I have got it in the bank; it is $300 and some odd dollars, possibly $400. I levied on their baggage. There was some clothing; I levied on one hat and *Page 651 
some slippers or shoes; I don't remember which. As nearly as I could, I took everything they possessed on their persons, everything in the clothing line, I suppose. That was just before the trial, I believe. I don't remember what day; I don't remember the exact date when I got possession of the writ. I have not the writ with me; it is filed in the Clerk's office. I think it was Saturday morning I received the writ, and I executed upon it immediately. I don't think I made a second levy under it after the preliminary examination. The trunk was given into my custody after the preliminary hearing. I don't know whether you call it a levy or not; I was sent for to take charge of the trunk; I took it into my custody, subject to the preliminary hearing in this case, and I don't know whether or not I levied on the trunk by virtue of that attachment or not; I had no other authority than that attachment writ for doing so. I now claim custody of the trunk on the authority that attachment gave; I don't know what else. I supposed I held it by that attachment. I have the money in the City National Bank. It is in my name for them; for the men whose persons it was taken from. I have had the custody of the Indian outfit since levying upon it by the attachment writ. I have made an exhibition of it since then to a great many people. I have let them see it. I could not tell how many had seen it in my office, too many to remember; one man was dressed up in it with my permission.
J. P. TURNER, RE-DIRECT EXAMINATION.
Being re-examined in direct by Mr. Brooks:
Twenty-first Exception. The trunk and contents spoken of by witness were offered in evidence, to which offer the defendants, by their counsel, then and there objected. Objection overruled, and exception.
The trunk being of the description heretofore given and *Page 652 
contained therein was: One book, Duns' rating on Tennessee, Louisiana, Mississippi and Missouri; one copy of the American Bank Reporter, printed by Aaron; one copy marked American Bank Reporter, without the printer's name; one pair of wire-cutters; one hand-vise; one screwdriver; one pair of small pinchers; one 2-foot rule; one 3-cornered file; one pair scales; 17 packages borings, purporting to be gold borings; four squares of oilcloth; 7 shawl straps; quite a number of small bits; several small brushes; three cans of bronzing liquid; two bottles of bronzing powder; bunch of hand maps of the different Southern States and parts of Canada; quite a number of blanks.
Twenty-second Exception. Here defendants moved to strike out all the evidence offered by the State by the trunk and its contents, and as testified to by the witness. Motion being denied, defendants, by their counsel, then and there except.
The witness, proceeding, said: I remember the day defendants were arrested; had seen Hawley and Daley at the hotel. I don't know the day, it was several days before the arrest. Mr. Daley was there the first time, it was a week, I think, or close on to that before the arrest. He was there three days and a quarter, or something like that. Paid me his bill, and left, I think, on the 9:55 train, and said he would come back. He came back. The first time he came, he brought some baggage with him, a trunk, which was checked and left in the office.
Twenty-third Exception. Here defendant Hawley, by his counsel, objects to the testimony of the witness, because it relates to conversation and acts between the witness and defendant Daley in the absence of defendant Hawley, is irrelevant and immaterial; which objection was overruled, and defendant Hawley, by his counsel, then and there excepts.
I gave him a check for the trunk, and it was put in the *Page 653 
hall between the elevator and the back door of the private entrance. It was there from that time up to and including the time of the arrest. During that time Hawley stopped at the hotel. He came there about two or two and a half days, I think, before the arrest; I am not positive about that. He remained there from the time he came until the arrest. The trunk was the only piece of baggage that I saw Daley leave. The trunk was delivered to the Sheriff; there were two came there after it.
The morning of the day of the arrest, Mr. Hawley was put on call for five o'clock. There was a train coming into Greensboro at 5:48, running from Washington to Columbia. One coming from Richmond might readily come on that train. It is a reasonably direct way by Danville from Norfolk. Don't know that prior to then Daley or Hawley met this train, they had never been put on call before. The passenger coach arrived from Raleigh in the morning about 5:15.
RE-CROSS-EXAMINATION OF J. P. TURNER.
Cross-examination by Mr. Gilmore:
I was present in the court-room yesterday, and heard the examination in this case.
Twenty-fourth Exception. Here counsel for defendants moved to strike out the testimony of the witness, upon the ground that he was in Court yesterday and heard the evidence of the witnesses testifying in the case, in violation of the order of the Court that excluded all the witnesses from the court-room during the progress of the trial. Motion overruled, and defendants, by their counsel, then and there excepted.
In examination by Mr. Barringer, witness said:
Mr. Hawley came on the 5:48 train for breakfast. He registered his name, and I gave him a room to himself; Daley had a room by himself. *Page 654 
RE-RE-DIRECT EXAMINATION OF J. P. TURNER.
Being examined in re-re-direct by Mr. Brooks, the witness said:
I think Mr. Daley registered the first time from Roanoke, and from Danville the second time. I don't think Mr. Daley's room was ever changed. Mr. Hawley's room was. He first occupied No. 43, on the second sleeping-floor, and was removed to 20 on the first sleeping-floor. Mr. Daley occupied 23 on the first sleeping-floor all the time he was there; that put them about three doors from each other, across the hall.
PROF. JOHN THOMPSON, DIRECT EXAMINATION.
The State then produced Prof. John Thompson, who, being sworn, testified as follows:
My name is John Thompson; reside at Greensboro; am a teacher of chemistry at the A. and M. College. Was educated in the University of Minnesota. I specialized chemistry. I am capable of making tests and determining the weight of that bar there. I have made an analysis of the borings taken from these pieces.
Was then asked by the State Solicitor this question: "What is the result?"
Twenty-fifth Exception. To which question defendants, by their counsel, objected to any evidence tending to show the substance or material which constitutes the alleged gold bricks in evidence in this case, as the same are not of the res gestae, are immaterial and irrelevant. Which objection was overruled by the Court, and defendants, by their counsel, then and there excepted.
The witness, proceeding, said: After testing I found them principally copper; I found no presence of gold. One was bored in three places, and the other in two. *Page 655 
The gold bricks, and the cloths in which they were bound, were offered in evidence, to which offer defendants then and there objected, because they were not of the res gestae, irrelevant and immaterial, and moved to strike out the testimony of witness relating to them. Which objection and motion by defendants was by the Court overruled and denied; to which ruling defendants, by their counsel, then and there duly excepted.
MARION COBB, DIRECT EXAMINATION.
The State then called as a witness Marion Cobb, who, being sworn, testified in substance as follows:
My name is Marion Cobb; my father is proprietor of the Hotel Guilford. I remember the occasion in March when these defendants were arrested. Prior to arrest, two of them, Daley and Hawley, stopped at the hotel. I have the hotel register in my hand, beginning in December and ending in April. This is the register in which they registered.
State closes.
And which is all the evidence offered by the State to prove its charge against the defendants under the indictment and the several counts thereof.
 MOTION BY DEFENDANTS FOR STATE TO ELECT — STATE ELECTS TO PROCEED ON FIRST COUNT.
Here defendants, by their counsel, moved the Court to require an election by the State on which count in the indictment it will rely for conviction against the defendants. Whereupon, the State, by its Solicitor, elected to rely upon the first count in the indictment, and enter a nolleprosequi to the second and third counts of the indictment, the other counts to be referred to as furnishing particulars. Which being done and entered by the Court in the said cause, the *Page 656 
defendants moved the Court to instruct the jury that upon the evidence adduced in this case, the defendants, as a matter of law, are not guilty, and the jury should so find and return their verdict accordingly. Which motion of the defendants the Court overruled, to which ruling of the Court the defendants then and there excepted.
Defense declines to offer any witnesses.
From a verdict of guilty, and judgment that defendant J. L. Howard be imprisoned in State Prison 10 years, defendant H. D. Hawley in State's Prison 10 years, and defendant A. R. Daley 7 years, the defendants appealed.
The defendants, J. L. Howard alias Thompson, Gonez Bono alias A. L. Daley, and H. D. Hawley, are indicted for a conspiracy to defraud. The indictment was in three counts. At the close of the evidence for the State, the defendants moved the Court to require an election by the State upon which count it would rely for conviction. Thereupon the Solicitor elected to rely upon the first count, and entered a "nolle prosequi as to the second and third counts — these other counts to be referred to as furnishing particulars." Upon this being done, the defendants asked the Court to instruct the jury to return a verdict of not guilty, and excepted to the refusal. The defendants introduced no evidence.
The three counts were simply a description of the same transaction in different ways, and the joinder was unobjectionable. The Court need not, therefore, have required an election. State v. Barber, 113 N.C. at page 714, citing State v. Morrison, 85 N.C. 561; State v. Allen, 107 N.C. 805;State v. Harris, 106 N.C. 682; State v. Parish, 104 N.C. 679;State v. Horan, 61 N.C. 571, 576. *Page 657 
The evidence is uncontradicted, and its chief features will be set out by the reporter in the statement of the case. It is almost dramatic in its details, and presents with striking clearness the methods of a fashion of swindling, which has doubtless been little practiced in this State. The indictment in full will also be copied by the reporter.
The first exception is, that the indictment did not set out the means by which the conspiracy was to be executed. The point is expressly decided inState v. Brady, 107 N.C. 822, where it is held, upon our own authorities, that a conspiracy to cheat and defraud need not charge the means to be used. Such was also the common law, as will be seen by reference to the English cases therein cited; also, citing Commonwealth v. McKisson, 8 S. 
R. (Pa.), 419; 3 Greenleaf Ev., sec. 95; and while stating that some States had held differently, this Court decided to abide by our own and the English rule. The learned counsel from Illinois, who ably argued this exception for the defendants, admitted this, but at great length endeavored to persuade us to overrule our own decisions, contending that the weight of authority in this country was to the contrary. We think not, but if it were, that alone would not be sufficient to induce us to change, unless injustice was shown to follow from our decisions. In fact, however, the weight of authority in other States seems to uphold our ruling. Among many cases to like effect are State v. Noyes, 25 Vt. 415; State v. Bartlett,30 Mo., 132; State v. Crowley, 41 Wis. 271; Thomas v. People, 113 Ill. 351;State v. Stewart, 59 Vt. 273; State v. Grant, 86 Iowa 216; People v.Clark, 10 Mich. 310; 2 Bish, New Crim. Proc., sec. 207 (2).
The Code of Civil Procedure, sec. 259, provides: "The Court may in all cases order a bill of particulars of the claim of either party to be furnished." In this case these particulars were fully furnished by the second and third counts, which were only nol prossed at the instance of the defendants *Page 658 
and after the close of the evidence, so that they were in full possession of all the information which a bill of particulars could have furnished them.
The next exception was for refusal of the motion to quash: "For that the allegations in the said bill of indictment, and in each and every count thereof, do not constitute a crime under the Ordinance of Conspirators, made and accorded by King Edward the First and his Council in the thirty-third year of his reign, A.D. 1305, nor by any statutes in England since that date, nor under any common law in force in the State of North Carolina at the date of the said alleged offense."
With reference to the statute 33 Edward I, de conspiratoribus, Judge Council charged the jury as follows:
"Its existence can be traced back centuries prior to our Independence, and such eminent ancient law writers as Coke, Hawkins and others, refer in their works to the existence of this crime prior to the passage of the Statute 33 Edward I, de conspiratoribus, which statute has been commented upon by counsel for the defendants. Law writers upon the subject of conspiracy generally agree that the statute referred to was only declaratory of the common law to the extent of the crimes enumerated in the act, leaving the common law as applicable to all other forms of conspiracy known to the law."
The cases sustaining his Honor's view of the law of conspiracy are numerous; among them, State v. Buchanan, 5 Harris and Johnson (Maryland), page 317, is an elaborate discussion of the question, covering fifty pages, and many authorities are cited. In this case, at page 333, the Court says: "Much reliance is placed on the statute of Edward I, de conspiratoribus on the supposition that the offense of conspiracy was originally created by that statute." The learned Judge then proceeds to show, pages 333-351, that the offense of conspiracy existed prior to the passage of 33 Edward I, was *Page 659 
passed in 1304, and on page 351 observes: "By a course of decisions running through a space of more than four hundred years from the reign of Edward I to the 59th of George III, without a single conflicting adjudication, these points are clearly settled:
"1. That the offense of conspiracy is of common law origin, and not restricted or abridged by the statute 33 Edward I.
"2. That a conspiracy to do any act that is criminal per se., is an indictable offense at common law, for which it can scarcely be necessary to offer any authority."
In State v. Burnham, 15 New Hamp., 396, Gilchrist, J., speaking for the Court, says: "In the first place, we have no doubt that conspiracy is an indictable offense in this State. It is punishable at common law, its punishment is most repugnant to our institutions, and it is an offense productive of much injury, and as deserving reprehension under one form of government as another."
To the same effect are Commonwealth v. Hunt, 45 Mass. 111; State v.Pulle, 12 Minn. 164.
In the last case the defendants were indicted for a conspiracy to assault one James H. Murray, to daub and put upon his naked body a great quantity of tar and feathers, and the point was made "that there is no statute in this State creating or defining the crime of conspiracy, nor is any punishment affixed by law to any such offense, and, therefore, this Court had no jurisdiction thereof. The Supreme Court held on appeal that conspiracy not declared a crime by the statute law was punishable because of the common law."
In United States v. McCord, 72 Fed. Rep., 159, it is said:
"The statutes of the United States do not define what a conspiracy is, or create any new offense. They merely recognize the crime of conspiracy as known to the common law and the courts must go to the common law to determine what it is."
In 2 Bishop's New Criminal Law, sec. 174, the statute of *Page 660 
33 Edward I is quoted in full, and the author adds, in subsection 2, the following:
"Since this statute contains no negative word, a principle explained in another connection shows that it abrogates nothing of the prior common law, but leaves indictable whatever of conspiracy was so before."
In State v. Younger, 12 N.C. 357, this Court held that "a combination of two or more to do any unlawful act, or one prejudicial to another, is indictable at common law as a conspiracy." State v. Brady, 107 N.C. 822;State v. Powell, 121 N.C. 635; State v. Wilson, 121 N.C. 650.
The cases already cited dispose of the other exceptions for refusal to quash. Some of the authorities cited by defendants are no longer authorities, since The Code of 1883 added to section 1025 the secondproviso thereof, that in indictments for false pretence, "it shall be sufficient in any indictment for obtaining, or attempting to obtain, any such property by false pretences, to allege that the party accused did the act with intent to defraud, without alleging an intent to defraud any particular person, and without alleging any ownership of the chattel, money or valuable security; and, on the trial of any such indictment, it shall not be necessary to prove an intent to defraud any particular person, but it shall be sufficient to prove that the party accused did the act with intent to defraud."
The third exception is as follows: "While the regular panel of jurors was in the court-room, the defendants moved to separate the witnesses and to exclude them from the courtroom while said jury was being selected and empaneled and during the trial of said cause. The Solicitor, objecting, said that the witness Paul Garrett would be the first witness examined, and the others would testify as to matters not in his knowledge, except the detection in Greensboro. Whereupon the Court remarked that it was a matter of discretion with *Page 661 
the Court, and that all the witnesses, except the complaining witness, Garrett, and the high Sheriff of the county, might be excluded from the Court; but as to these witnesses, their high character as citizens forbade the idea that either of them would be influenced by the testimony of the other." It would indeed be sufficient to say that it does not appear that any one of the jurors, who actually sat on the trial, heard the remark; but we prefer to put our ruling upon broader ground. By the common law, Judges were not prohibited from expressing an opinion upon the facts, and this is still true of the Federal Courts and all the States in which there is no statute making a change in this respect. In North Carolina, the only change is that made by the Act of 1796, now Code, sec. 413, which reads as follows: "No Judge, in giving a charge to the petit jury, either in a civil or a criminal action, shall give an opinion whether a fact is fully orsufficiently proven." This is the extent of the statutory change. It goes no further. In State v. Angel, 29 N.C. 27, Ruffin, C. J., says: "The `facts' on which the act (1796) restrains him (the Judge) from expressing an opinion to the jury are those respecting which the parties take issue or dispute, and on which, as having occurred or not occurred, the imputed liability of the defendants depends." In State v. Laxton, 78 N.C. 564, Smith, C. J., says: "It is quite obvious from the words of the act that its special object was to prevent the intimation of such opinion in connectionwith and constituting a part of the instructions by which the jury were to be governed, and when its influence on their minds would be direct and effective." To same purport in DeBerry v. Railroad, 100 N.C. 310; Statev. Robertson, 86 N.C. 628; State v. Jones, 67 N.C. 285. These were cases in which the remarks were made by the Judge during the progress of the trial, but it is not necessary that we pass upon the question whether the remark here made by the Judge would be ground for setting aside the verdict *Page 662 
if made during the progress of the trial, for it was not made at such time. At the time when made, no juror had been selected, and the remark was not "to the jury," nor did it contain any opinion that "a fact was fully or sufficiently proven." No fact had been shown in evidence. The remark was not prohibited at common law, and is certainly not prohibited by any terms in the statute. No decision of our Court has ever hinted that a statute forbidding the Judge "in a charge to the petit jury" from "expressing an opinion whether a fact is fully or sufficiently proven," extended to the remarks of a Judge complimentary to one (who was afterwards examined as a witness) made before the jury was selected or empaneled. In every case where such a proposition has been presented, this Court has denied the application of the statute. State v. Jacobs, 106 N.C. 695; S.C., 107, N.C. 774: State v. Jackson, 112 N.C. 853.
The defendants except to the sentence imposed of imprisonment in the penitentiary, but concede that this Court has ruled otherwise in State v.Mallett, 125 N.C. 718, which we re-affirm.
The other exceptions were without merit and were not seriously pressed in this Court.
Affirmed.